**SILVERSTAR ENTERPRISES, INC., Plaintiff,**

v.

**Marvin Lee ADAY, known professionally as "Meat Loaf", Meat Loaf Enterprises, Inc., Robert Ellis, R.T.C. Management, Inc. and various John Does, Jane Does and XYZ Company, Defendants.**

**No. 82 Civ. 1835 (DNE).**

United States District Court, S. D. New York.

March 31, 1982.

Patrick J. Monaghan, Jr., Hackensack, N. J., for plaintiff.

Franklin, Weinrib, Rudell & Vassallo, P. C., New York City; John Vassallo, Neil J. Rosini, New York City, of counsel, for defendant Meat Loaf Enterprises, Inc.

## OPINION AND ORDER

EDELSTEIN, District Judge:

This is an action for trademark infringement, unfair competition, and certain violations of a licensing agreement brought under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and principles of pendent jurisdiction. Plaintiff also seeks a declaratory judgment pursuant to 28 U.S.C. § 2201. Plaintiff alleges that jurisdiction exists under 15 U.S.C. § 1051 *et séq.* and 28 U.S.C. § 1338.

## FACTUAL BACKGROUND

Plaintiff Silverstar Enterprises, Inc. ("Silverstar") is a Delaware corporation with its principal place of business in New York. Defendant Marvin Lee Aday, known professionally as "Meat Loaf", is an internationally known performing and recording artist, and is a citizen and resident of Connecticut. Defendant Meatloaf Enterprises, Inc. ("MLE") is a New York corporation, with its principal place of business in New York. The stock of MLE is principally owned by Meat Loaf. Defendant Robert Ellis ("Ellis") is alleged to be a citizen and resident of New York and a principal of defendant R.T.C. Management, Inc., a New York corporation with an office in New York.

On September 30, 1981, Silverstar entered into a license agreement (the "License") with Meat Loaf and MLE in which Silverstar was granted for a five year period the exclusive ·world-wide license to use the

name and registered trademark MEAT LOAF and various representations thereof, and to market clothing and other articles bearing these names and characters. Pursuant to the License, Silverstar, with Meat Loaf's and MLE's consent, has manufactured and marketed MEAT LOAF products throughout the United States.

The instant proceedings arise out of arrangements for a Meat Loaf concert tour in Europe scheduled to commence on April 1, 1982. In connection with the promotion of this tour, on November 23, 1981, Silverstar entered into a sub-licensing agreement with Bravado Merchandising Services, Inc., ("Bravado") to manufacture T-shirts, jerseys, buttons, hats, scarves and a tour book bearing the MEAT LOAF trademark for sale at the concert halls on the tour. Pursuant to Paragraph 10 of the License, Silverstar does not have the right to grant sub-licenses except upon the prior written approval of the Licensor. Silverstar does not contend that it received prior written approval of the sub-licensing agreement. It does, however, contend that certain actions on the part of Meat Loaf constitute a waiver or should act as an estoppel with respect to the written consent provision of the license.

On March 9, 1982 by telephonic communication, and followed on March 13, 1982 by written notification, Meat Loaf and MLE informed Silverstar that they objected to the sub-licensing agreement with Bravado. Silverstar alleges that on or about these dates MLE and Meat Loaf, contrary to the terms of the License, engaged another party to provide merchandising services for the tour.[1] On March 23, 1982, Silverstar filed the complaint in this matter and, by order to show cause, applied to this court for a

preliminary injunction enjoining defendants from manufacturing and selling MEAT LOAF items and from interfering with Silverstar's duties under the License agreement. Silverstar also sought *ex parte* a temporary restraining order pending the hearing on the preliminary injunction. Silverstar contends that defendants' actions violate Silverstar's exclusive trademark license and will cause Silverstar irreparable injury.

The court denied the *ex parte* application for the temporary restraining order and scheduled a hearing on the restraining order for the following day. At the hearing, counsel for MLE advised that his client's position is that Silverstar had breached the licensing agreement, and that the License is no longer in force. Counsel for MLE further represented that MLE had engaged Bravado to provide merchandising services in connection with the upcoming European tour. Silverstar, in response, argued that the terms of the License provided an opportunity to cure any breach, and thus that MLE's action was in violation of the License agreement.[2] After the hearing, the court denied the application for the order, and instructed the parties to provide the court with memoranda on the issues of jurisdiction and standing under the Lanham Act.

## DISCUSSION

Silverstar brings this action pursuant to the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and predicates this court's jurisdiction on 15 U.S.C. § 1121 and 28 U.S.C. § 1338. Silverstar concedes that no diversity jurisdiction exists. Further, it is undisputed that Silverstar's claims arise from the License agreement entered into by Silverstar, Meat Loaf and MLE.

1. In the affidavit accompanying the order to show cause for a preliminary injunction and temporary restraining order, Silverstar, through its President David A. Sonnenberg, stated that defendant Ellis is currently acting as Meat Loaf's manager and negotiating with companies to manufacture goods which are covered by the License.

2. Meat Loaf, although he had notice of the hearing, did not appear and was not represent-

ed by counsel. At the hearing, the court held that plaintiff's efforts to give Meat Loaf notice were sufficient and that Meat Loaf would be bound by the outcome. It is unclear whether defendant Ellis or the corporation of which he is allegedly a principal, defendant R.T.C. Management, Inc. received actual notice of the hearing. Because of the disposition of this matter, however, there is no prejudice to these defendants.

■ Silverstar contends that as the exclusive licensee of the trademark MEAT LOAF it has standing under the Lanham Act to bring an action for trademark infringement, 15 U.S.C. § 1114, and for unfair competition, 15 U.S.C. § 1125(a).[3] Although there is case law discussing the standing of an exclusive licensee to bring an action under the Lanham Act, there does not appear to be any reported decision as to whether such an action may be brought by the licensee against the registrant/licensor of the trademark.

### A. Section 1114

Section 1114 provides that any person infringing a registered trademark "shall be liable in a civil action by the registrant for the remedies hereinafter provided ..." Although the language of § 1114 speaks of an action by the "registrant," § 1127 further defines that term to include the legal representatives, predecessors, successors and assigns of the registrant. As Silverstar concedes, an assignment of a trademark is a transfer of the entire interest while a license, which Silverstar has, confers only the right to use the trademark. *See* 3 Callmann, *Unfair Competition, Trademarks and Monopolies*, § 78.2 at 452–53 (3d ed. 1969).

The Second Circuit, in *DEP Corp. v. Interstate Cigar Co.*, 622 F.2d 621 (2d Cir. 1980), held that an exclusive distributor in the United States of a particular soap lacked standing to maintain an infringement action under § 1114 against other corporations selling the soap in the United States. The contract granting the plaintiff, DEP Corp., exclusive distribution rights stated that DEP Corp. was to notify the licensor of an infringement of the licensed trademarks, and that DEP Corp. had no rights in the trademarks. The court first observed that the license agreement did not constitute an assignment of any of the rights in the trademarks, and that DEP Corp. did not fall within the class expressly authorized to sue under § 1114.

The Second Circuit then proceeded to analyze many of the same cases that have been cited here by Silverstar as supporting standing under the Lanham Act. The first case relied upon by DEP Corp. and Silverstar, *G. H. Mumm Champagne v. Eastern Wine Corp.*, 142 F.2d 499 (2d Cir.), *cert. denied*, 323 U.S. 715, 65 S.Ct. 41, 89 L.Ed. 575 (1944), held that the exclusive distributor in the eastern part of the United States of a French company's trademarked champagne had standing to bring a trademark infringement action against another domestic corporation which had imitated the foreign producer's trademark. The Second Circuit in *DEP Corp.* distinguished *G. H. Mumm* on the following grounds: (1) *G. H. Mumm* was decided before the Lanham Act became effective and was not subject to the explicit standing requirements for a trademark infringement action; (2) 53% of the common stock of the plaintiff was owned by the French Company whose trademark was in dispute, and the French Company was not a party to the action because of its enemy alien status in World War II; (3) the plaintiff had been designated as the party upon whom process might be served; and (4) the plaintiff's contract did not contain a clause asserting that the plaintiff had no right or interest in the mark.

---

**3.** Silverstar does not refer to Section 1114 in its complaint. In its memorandum submitted on the jurisdictional question Silverstar argues for the first time that it has a cause of action and standing under Section 1114. Silverstar states that "Count II [of the complaint, which] alleges a conspiracy to infringe and impair Plaintiff's exclusive trademark license ... would be a claim of infringement under 15 U.S.C. 1114." Silverstar then concentrates on Section 1114 to support its position that the court has jurisdiction of this matter. The court finds that even under the permissive rules of notice pleading, *see* Fed.R.Civ.P. 8, plaintiff's complaint did not adequately inform defendants of a claim under Section 1114. Count II sounds in tortious interference of contract rather than in trademark infringement.

MLE, in its memorandum on the jurisdiction question, focused its argument on Section 1125(a), a violation of which is alleged in Count I of Silverstar's complaint. Not surprisingly, MLE did not devote much attention to an infringement claim under Section 1114. Because of the disposition of this matter, MLE is not prejudiced by Silverstar's defective pleading.

■ The second case relied upon by the plaintiff here and the plaintiff in *DEP Corp., Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 159 (1st Cir. 1977) states that "trademark infringement suits [may] be maintained by *exclusive* distributors and sellers of trademarked goods, i.e. 'exclusive licensees' who had a right by agreement with the owner of the trademark to exclude even him from selling in their territory." (Emphasis in original.) The Second Circuit, in *DEP Corp.*, both distinguished and criticized this statement in *Quabaug.* Noting that the *Quabaug* statement was dictum, the court stated that the cases relied upon to support the dictum are inapposite:

> The cases cited for this proposition in *Quabaug Rubber Co.* are inapposite. *G. H. Mumm Champagne v. Eastern Wine Corp., supra*, we have already distinguished. *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F.Supp. 1341 (E.D.Pa.1972), aff'd per curiam, 480 F.2d 917 (3rd Cir. 1973) involved a plaintiff who was not only a sole user of a British company's mark in the United States on some products, but was also a wholly-owned subsidiary of the British company. (See 15 U.S.C. § 1055). In *Browne-Vintners Co., Inc. v. National Distillers and Chemical Corp.*, 151 F.Supp. 595 (S.D.N.Y.1957), while the court did state that an exclusive distributor had a sufficient interest of its own in the marks to entitle it to register them in its name, we note that the registered trademark owner and a related company (15 U.S.C. § 1055) were also parties plaintiff.

There is nothing in the opinion to indicate that the distribution agreement expressly provided, as in the instant case, that the distributor would have no right in the mark. *Ste. Pierre Smirnoff, FLS., Inc. v. Hirsch*, 109 F.Supp. 10, 12 (S.D.Cal.1952) is cited in *Quabaug Rubber Co.* as authority for the proposition that an exclusive licensee is an assignee under 15 U.S.C. § 1127, 567 F.2d at 159 n.8. However, in that case the plaintiff was the owner of the entire exclusive and irrevocable right in the business, its good will and the trademark in question. The court in *Hirsch* noted that the plaintiff was an assignee and not a mere licensee. 622 F.2d at 623 n.2. In the present case it is clear that the licensor retained ownership of the marks. Paragraph 13 of the License states that the "Licensee and all parties to this Agreement acknowledge the Licensor's exclusive right, title and interest in and to the Service Marks, Trademarks and/or Copyrights . . . ." Thus, it appears that the Court of Appeals' pronouncement in *DEP Corp.* may be controlling of this case.[4]

Even assuming Silverstar has standing to maintain an infringement action under § 1114, it does not have standing to maintain such an action against the registrant. MLE, as the registrant of the mark MEAT LOAF, has the right to sue for trademark infringement according to the terms of § 1114. Silverstar's interest in the trademark arises solely from the contractual relationship between it and MLE, and such interest is secondary to the registrant's.

4. Paragraph 20 of the License agreement, not raised by Silverstar, does place certain rights to sue with the Licensee:

> Licensee is hereby authorized to incur reasonable legal expenses and associated necessary and reasonable expenses of enforcement . . . to prevent the unauthorized sale or distribution of any Licensed Product hereunder, and Licensor agrees that any such expenses so incurred shall be deducted from gross receipts on which Licensor's compensation is computed hereunder. Licensor hereby appoints and designates Licensee as its attorney-in-fact for preventing and prosecuting any such unauthorized sale or use. Licensor hereby grants to Licensee the right to institute legal proceedings in the name of Licen-

sor, which are necessary or appropriate pursuant to this paragraph.

Thus, it is remotely conceivable that MLE designated Silverstar as its legal representative, as defined in § 1127, for the purposes of bringing an action under the Lanham Act.

However, MLE in Paragraph 20 clearly did not intend to authorize Silverstar to bring a trademark action against itself. In Paragraph 20, MLE agrees to pay for the expenses incurred by Silverstar in preventing unauthorized sales or use. It strains credulity that MLE in Paragraph 20 intended to finance a lawsuit by Silverstar against itself. Thus, Silverstar must rely on a basis other than express contractual authorization for standing to maintain this action.

Any right Silverstar may have to sue under the Lanham Act, *a fortiori*, is derivative of the rights of the registrant MLE. Therefore, in the present case, Silverstar's only standing under the Lanham Act would be on behalf of Meat Loaf and MLE to enforce the trademark owner's proprietary rights.

In this action, Silverstar is not attempting to enforce the registrant's proprietary rights. Rather, the licensee Silverstar is attempting to enforce its own rights under the License agreement. This is a contract dispute and should be brought under a contract theory. Such a suit cannot properly be maintained as a trademark infringement action under § 1114.

■ Issues similar to the one presented in this case have arisen more frequently in the context of patent and copyright actions. Courts generally have dismissed actions which fundamentally assert contract claims and only incidentally involve patents or copyrights. As Judge Friendly stated in *T. B. Harms Co. v. Eliscu*, 339 F.2d 823, 826 (2d Cir. 1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965), with respect to exclusive federal jurisdiction under 28 U.S.C. § 1338:

> ... [T]he federal grant of a patent or copyright has not been thought to infuse with any national interest a dispute as to ownership or contractual enforcement turning on the facts or on ordinary principles of contract law. Indeed, the case for an unexpansive reading of the provision conferring exclusive jurisdiction with respect to patents and copyrights has been especially strong since expansion would entail depriving the state courts of any jurisdiction over matters having so little federal significance.

*See also Milprint, Inc. v. Curwood, Inc.*, 562 F.2d 418, 420 (7th Cir. 1977); *Wells v. Universal Pictures Co.*, 166 F.2d 690, 691 (2d Cir. 1948); *Stepdesign, Inc. v. Research Media, Inc.*, 442 F.Supp. 32, 33–34 (S.D.N.Y. 1977); *Diematic Manufacturing Corp. v. Packaging Industries, Inc.*, 381 F.Supp. 1057, 1060 (S.D.N.Y.1974), *appeal dismissed*, 516 F.2d 975 (2d Cir.), *cert. denied*, 423 U.S. 913, 96 S.Ct. 217, 46 L.Ed.2d 141 (1975).

Section 1338 applies to trademarks as well as patents and copyrights. Just as the mere existence of a patent or copyright does not confer federal jurisdiction over what is essentially a contract dispute, the mere existence of a trademark in the present case does not establish federal jurisdiction. Because no diversity jurisdiction exists here, Silverstar's § 1114 trademark claim must be dismissed.

### B. Section 1125(a)

■ Silverstar also alleges a cause of action under 15 U.S.C. § 1125. Section 1125(a) creates civil liability to "any person who believes that he is or is likely to be damaged by the use of any such false description or representation." The section is broader than § 1114 in that it covers false advertising or description whether or not it involves trademark infringement. Further, standing under this section may lie with users of trademarks who are not owners of the marks. *See D. M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F.Supp. 1261, 1268 (S.D.N.Y.1970).

■ In order to state a claim under § 1125(a) the plaintiff must allege that the false description or association will result in a likelihood of consumer confusion. *See Exquisite Form Industries, Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403, 410, 413 (S.D.N.Y.1973). Although Silverstar alleges that MLE is about to breach the license agreement, it has not alleged or argued any confusion will result as to the source of MEAT LOAF products. In fact, during the hearing on this matter MLE stated it had selected the same merchandiser, Bravado, that plaintiff had attempted to have approved as its sub-licensee. Thus, it appears that there will be only one source of the goods in question and that no confusion will result. In addition, Silverstar does not allege that MLE will use Silverstar's own name or trademark, if any, in connection with the merchandising of MEAT LOAF products. Silverstar therefore fails to state a claim under § 1125(a) for false designation or false description.

As noted in the discussion of trademark infringement under § 1114, this case is essentially a contract dispute between an exclusive licensee and a licensor over the right to use the trademark MEAT LOAF. Silverstar's dispute should be determined by the principles of contract law, as it is the contract that defines the parties' relationship and provides mechanisms to redress alleged breaches thereto. The Lanham Act, in contrast, establishes marketplace rules governing the conduct of parties not otherwise limited. This is not a case of either the licensee or licensor attempting to protect a trademark from unscrupulous use in the marketplace by third parties. Rather, this case involves the alleged breach of a license agreement. This court, however, does not have jurisdiction over such a contract dispute without diversity of citizenship.

Accordingly, Silverstar's complaint is dismissed.

IT IS SO ORDERED.