**SHONEY'S, INC., a Tennessee Corporation, Doing Business in Virginia as Shoney's Inc. of Tennessee and Shoney's Lodging, Inc., a Tennessee Corporation, Plaintiffs,**

v.

**Leon SCHOENBAUM, etc. and Shoney's Incorporated, a Virginia Corporation, Defendants.**

**Civ. A. No. 86–171–NN.**

United States District Court,
E.D. Virginia,
Norfolk Division.

May 11, 1988.

---

Hunter W. Sims, Jr., Terence Murphy, Kaufman & Canoles, Norfolk, Va., Gary M.

Brown, Trabue, Sturdivant & Dewitt, Nashville, Tenn., for plaintiffs.

Herbert V. Kelly, Michael B. Ware, Newport News, Va., for defendants.

## MEMORANDUM

WALTER E. HOFFMAN, Senior District Judge.

In the "Order on Final Pretrial Conference," dated June 12, 1987, the parties stipulated to the following undisputed facts:

1. Plaintiff, Shoney's, Inc., is a corporation organized and existing under the laws of the State of Tennessee, has its principal place of business in Nashville, Tennessee, is domesticated in and is doing business in Virginia as Shoney's, Inc. of Tennessee (hereinafter "Shoney's–Tennessee").

2. Plaintiff, Shoney's Lodging, Inc. (hereinafter "Shoney's Lodging"), is a corporation organized and existing under the laws of the State of Tennessee and has its principal place of business in Nashville, Tennessee. Shoney's Lodging is a wholly-owned subsidiary corporation of Shoney's–Tennessee.

3. Defendant, Leon Schoenbaum, is a citizen of the Commonwealth of Virginia and resides in Williamsburg, Virginia.

4. Defendant, Ruth Ann Schoenbaum, is a citizen of the Commonwealth of Virginia, is the wife of Leon Schoenbaum, and resides in Williamsburg, Virginia (hereinafter collectively "the Schoenbaums").

5. Defendant, Shoney's Incorporated, is a corporation organized and existing under the laws of the Commonwealth of Virginia, having its principal place of business in the City of Newport News, Virginia (hereinafter "Shoney's–Virginia").

6. Shoney's–Virginia is a corporation whose officers and directors are the Schoenbaums and whose stock is wholly owned by Leon and/or Ruth Ann Schoenbaum.

7. The amount in controversy exceeds the sum or value of $10,000.00, exclusive of interest and costs, and the controversy is between citizens of different states.

Therefore, diversity jurisdiction exists pursuant to 28 U.S.C. § 1332.

8. The matters at issue between the parties involve an actual controversy relating to allegations of actual or threatened violation of federal laws. Therefore, jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1337 and 1338.

9. Pursuant to 28 U.S.C. § 2201, the plaintiffs seek a determination and declaration of their rights and legal relations with the defendants.

10. The Schoenbaums, either directly or through Shoney's–Virginia, operate certain "Shoney's" restaurants in the Tidewater area of Virginia.

11. The "Shoney's" service mark is owned by Shoney's–Tennessee and is licensed, by license agreements, to independent franchises. The "Shoney's" service mark was registered on the Principal Register of the United States Patent and Trademark Office on March 28, 1978, and bears Registration No. 1,088,370 for restaurant services.

12. Prior to April 13, 1984, most Shoney's restaurants were operated in affiliation with the "Big Boy" trademarks and service marks, which are owned by Marriott Corporation (hereinafter "Marriott").

13. On April 13, 1984, Shoney's–Tennessee and Marriott entered into a contract whereby Shoney's–Tennessee and its Shoney's restaurant franchisees disaffiliated from the "Big Boy" trademark. The contract with Marriott required Shoney's–Tennessee to obtain certain agreements from each of its Shoney's restaurant franchisees existing at that time in the event said franchisees elected to remain a "Shoney's" restaurant and franchisee.

14. On April 13, 1984, the Schoenbaums were Shoney's restaurant franchisees, having a territory in Virginia consisting of the Cities of Chesapeake, Hampton, Newport News, Norfolk, Portsmouth, Saluda, Suffolk, Virginia Beach, West Point, Williamsburg and Yorktown, and the Counties of Gloucester, Isle of Wight, James City, Matthews, Northampton, Southampton, Surry,

Sussex, and York (hereinafter "the Schoenbaum Territory").

15. The Schoenbaums and Shoney's–Tennessee, pursuant to the terms of the April 13, 1984 contract between Shoney's–Tennessee and Marriott, entered into an. Agreement dated May 9, 1984.

16. Pursuant to the Agreement of May 9, 1984, the Schoenbaums made certain agreements relating to their Shoney's restaurants in their territory, including the discontinuance of the use of Marriott's "Big Boy" trademarks and service marks.

17. Thereafter, pursuant to and in accordance with said Agreement of May 9, 1984, Shoney's–Tennessee and the Schoenbaums entered into a License Agreement dated October 15, 1984.

18. The "Shoney's Inn" service mark is owned by Shoney's–Tennessee and was registered on the Principal Register of the United States Patent and Trademark Office on February 16, 1982, and bears Registration No. 1,190,289 for motel services. (It specifically provides for a disclaimer as to the right to the exclusive use of the word "Inn.").

19. By contract dated August 20, 1985, Shoney's Lodging and William I. Darter d/b/a Urban Developers, Inc. (hereinafter "Darter"), entered into a Shoney's Inn License Agreement for the operation of a Shoney's Inn, using, among other things, the "Shoney's Inn" service mark, at U.S. Route 60 at Waller Mill Road in York County, Virginia. The Williamsburg Shoney's Inn is presently open and operating.

20. Danner Foods, Inc. was a Tennessee corporation incorporated November 1, 1968. On or about February 1, 1971, Danner Foods, Inc. acquired, by way of merger, certain corporations and all of their assets in which Alex Schoenbaum was the principal shareholder, including two West Virginia corporations, Big Boy Franchises, Inc. of West Virginia and Parkette Commissary, Inc. The successor corporation after the merger was Danner Foods, Inc. The name of Danner Foods, Inc. thereafter was changed to Shoney's Big Boy Enterprises, Inc. In 1976, Shoney's Big Boy Enterprises, Inc. changed its name to Sho-

ney's Inc., a Tennessee corporation, doing business in Virginia as Shoney's–Tennessee.

21. Parkette Commissary, Inc., a West Virginia corporation, owned trademark Registration No. 652,848 for the service mark "Shoney's" for restaurant services. This trademark was registered on October 8, 1957, on the Principal Register in the United States Patent and Trademark Office. The registration was not renewed and lapsed on October 8, 1977. Shoney's–Tennessee, through its predecessor corporations, acquired this trademark and all rights and obligations in connection therewith in the merger set forth in the preceding paragraph.

22. On May 25, 1956, the Commonwealth of Virginia State Corporation Commission issued a charter for Shoney's, Incorporated, a Virginia corporation.

The License Agreement dated October 15, 1984 (plaintiff's Exhibit 6) (hereinafter "the 1984 Agreement"), provides that the defendant licensees have "the exclusive right to use the Shoney's System, Trade Names and Marks within the licensed Territory...." The 1984 Agreement territory, listed in "Exhibit A" to the Agreement, includes the Cities of Chesapeake, Hampton, Newport News, Norfolk, Portsmouth, Saluda, Suffolk, Virginia Beach, West Point, Williamsburg and Yorktown, and the Counties of Gloucester, Isle of Wight, James City, Matthews, Northampton, Southampton, Surry, Sussex, and York (hereinafter "the Tidewater area"). This is the same area referred to as "the Schoenbaum Territory" in stipulated fact no. 14 which was the pre–1984 Agreement territory.

Darter, referred to in stipulated fact no. 19, is in the business of hotel property development and pursuant to the licensing agreement dated August 20, 1985 between Shoney's Lodging and Darter, he opened a Shoney's Inn on U.S. 60 at Waller Mill Road in Williamsburg, Virginia. At the time when he became interested in the Williamsburg location he already operated four to six other Shoney's Inns outside of the Tidewater area. Darter testified that

the usual practice was for the motel licensee to contact the restaurant licensee to work out an agreement for the area.

Prior to entering into the licensing agreement and opening of the inn, Darter spoke with Leonard Goodman, a representative of the Schoenbaum's organization, in the fall of 1983. He inquired of Goodman whether Shoney's–Virginia would be interested in opening a Shoney's restaurant adjacent to the Williamsburg inn. Goodman responded in January of 1984 that his organization would not be interested since there was already a Shoney's restaurant within a mile of the proposed site.

The conversations between Darter and Goodman took place in late 1983 and early 1984, while the Darter licensing agreement was not signed until August of 1985. In November of 1985, Mr. Herbert Kelly, counsel for the Schoenbaums, wrote to Darter and advised him that the Schoenbaums owned the exclusive rights to the name "Shoney's" in the Tidewater area, and that Darter's use of the name Shoney's on a motel in Williamsburg would violate the Schoenbaum's rights. Kelly advised him that such use would result in the Schoenbaums seeking injunctive relief and damages for the violation of their franchise rights.

Darter admitted at trial that his understanding was that his license did not give him the right to open a restaurant of any kind next to the Shoney's Inn. He denied that he was ever advised that he was required to get the Schoenbaums's approval to build an inn in the Tidewater area.

This controversy arises out of the licensing of a Shoney's Inn to William I. Darter and the subsequent opening and operating of that Shoney's Inn in Williamsburg, Virginia, which is a part of the Tidewater area under the 1984 Agreement. The parties failed to agree upon the triable issues as is evidenced by the "Order on Final Pretrial Conference." The issues which the court concludes to be present are:

1) Do the defendants have the right to open anything other than restaurants under the 1984 Agreement?

2) Have the plaintiffs violated any rights of the defendants under the Lanham Act by licensing Darter to use the Shoney's Inn trademark in the Tidewater area?

3) Did the plaintiffs breach the 1984 Agreement by licensing Darter to use the Shoney's Inn trademark in the Tidewater area?

## DISCUSSION

### 1. *Contract Rights*

The first issue which must be addressed involves the rights of the respective parties under the 1984 Agreement. In determining these rights, the law applicable to this contract must be decided. Section VI, paragraph 6 of the 1984 Agreement states:

> The terms of this agreement shall be interpreted and construed in accordance with the laws of the State of Tennessee.

When the intention of the parties is expressed in the agreement as to the law of which state shall apply, then the court should honor their intent. *New England Oil Corp. v. Island Oil Marketing Corp.*, 288 F. 961, 967 (4th Cir.), *cert. denied*, 263 U.S. 702, 44 S.Ct. 7, 68 L.Ed. 514 (1923); *Union Planters National Leasing, Inc. v. Woods*, 687 F.2d 117, 119 n. 1 (5th Cir. 1982); *Barzda v. Quality Courts Motel, Inc.*, 386 F.2d 417, 418 (5th Cir.1967). The question which requires the application of Tennessee law in interpreting the contract is the introduction of parol evidence, i.e., the parol evidence rule.[1] Simply stated, the parol evidence rule prohibits the introduction of evidence of any prior or contemporaneous agreements which are inconsistent or vary the terms of a written contract. *Early v. Street*, 192 Tenn. 463, 241 S.W.2d 531, 535 (1951); *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832, 838 (Tenn. Ct.App.1980).[2]

The defendants argue for the court to consider letters of 1955 (Defendants' Exhibit 9) and of 1970 (Defendants' Exhibit 10) in determining the defendant's rights to the trade name Shoney's under the 1984 Agreement, which letters do not limit the use of "Shoney's" to restaurants. Plaintiffs contend that the contract is a total integration of the parties' agreement and, therefore, the parol evidence rule prohibits the introduction of any prior agreements. This contention rests upon Section VI, paragraph 2, of the 1984 Agreement which provides:

> This agreement and any addendum hereto contains the entire agreement between the parties hereto *relating to the operation of restaurants* within the Licensed Territory and there are no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, between the parties other than those set forth therein. No agreement of any kind relating to the matters covered by this agreement shall be binding upon either party unless and until the same is made in writing and executed by all interested parties. (Emphasis added).

In discussing the total integration issue, the Supreme Court stated that "when the writing itself upon its face is couched in such terms as import a complete legal obligation without any uncertainty as to the object or the extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, were reduced to writing." *Seitz v. Brewers' Refrigerating Machine Co.*, 141 U.S. 510, 517, 12 S.Ct. 46, 48, 35 L.Ed. 837 (1891). Likewise, an agreement which had a provision for strict enforcement of the parol

---

**1.** In *Union Planters National Leasing, Inc. v. Woods*, 687 F.2d 117 (5th Cir.1967), the court was confronted with the question of whether the parol evidence rule should be applied. The court concluded that since the contract provided that it be construed under Tennessee law, although the lease was signed and the action was brought in Mississippi, the parol evidence rule as in Tennessee should be applied. *Id.* at 119–20 & n. 1. Granted this is a "license agreement," but it is governed by the same rules used

in the interpretation of contracts generally. *Huber Baking Co. v. Stroehmann Bros. Co.*, 252 F.2d 945, 953 (2nd Cir.), *cert. denied*, 358 U.S. 829, 79 S.Ct. 50, 3 L.Ed.2d 69 (1958).

**2.** Although the court is applying Tennessee law, the parol evidence rule is basically the same in Virginia. *See, Amos v. Coffey*, 228 Va. 88, 91–92, 320 S.E.2d 335, 337 (1984).

evidence rule was found to be totally integrated and not subject to parol evidence in *Cecil Corley Motor Co. v. General Motors Corp.*, 380 F.Supp. 819, 828–29 (M.D.Tenn. 1974) (discussing the parol evidence rule in Tennessee). The "entire agreement" clause clearly shows the parties' intentions for this contract to be totally integrated, encompassing their entire agreement. Therefore, the court concludes that the parties' rights under the 1984 Agreement, including the right to the trade name Shoney's, must be determined by looking to the 1984 agreement alone, without reference to prior writings and negotiations.

The defendants argue that the letters of 1955 and 1970, wherein Leon Schoenbaum was granted the *exclusive* right to use the name "Shoney's" in the Tidewater area of Virginia, made no reference to a restaurant business, and hence covered the use of the name for any purpose. It is clear, however, from the evidence that, in 1955 and 1970, the parties were thinking and talking only about the operation of a restaurant business and not for other purposes. Nevertheless, this conclusion does not resolve the case.

The 1984 Agreement provides in Section I, paragraph 1, for the defendant-licensees to have "the exclusive right to use the Shoney's System, Trade Names and Marks within the Licensed Territory...." On page one of the 1984 Agreement, "Shoney's System" is defined as a "system of owning and operating restaurants." This alone suggests that the plaintiff/licensor granted the defendant/licensees the exclusive right to open and operate *only restaurants* in the licensed territory.

Although an agreement is completely integrated and parol evidence of prior or contemporaneous agreements barred, ambiguous terms in the agreement may be explained by the use of parol evidence which shows the intentions of the parties. *Anderson v. St. Louis Terminal Warehouse Co.*, 173 F.2d 436, 438 (6th Cir.1949) (discussing the parol evidence rule in Tennessee). However, there is no ambiguity as to the parties' intent since the agreement speaks of restaurants, and restaurants only. Provisions for menus, recipes, food products, food ingredients, restaurant association membership and other restaurant oriented items appear throughout the contract. The agreement clearly is meant to give nothing more than exclusive rights to open and operate Shoney's restaurants. Nowhere does the agreement mention or even allude to lodging or inns. Therefore, the court concludes that the 1984 Agreement grants the defendants the exclusive right to open and operate Shoney's restaurants in the Tidewater area, but no right to open and operate lodging facilities, i.e., Shoney's Inns.

### 2. Lanham Act

#### A. Trademark Infringement

Since the defendants' have been granted the "exclusive right to use the Shoney's System, Trade Names and Marks ..." in the Tidewater area, and the Shoney's System, as defined on page one of the 1984 Agreement, includes the "name 'Shoney's,'" the defendants' claim an infringement of their rights under 15 U.S.C. § 1114 (1982) (Lanham Act). The pertinent portion of that section provides:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

In licensing Darter and allowing him to build a Shoney's Inn in Williamsburg (a part of the Tidewater area), the plaintiffs are charged with infringing the defendants' right to the exclusive use of the trade name Shoney's in the Tidewater area because of the "likelihood of confusion." This alleged confusion is that the public is likely to mistake Shoney's and Shoney's Inn to be owned by the same person. Darter's Shoney's Inn might derive benefit from any established goodwill of the defendants or might injure the goodwill of the same by operating a Shoney's Inn in an improper manner. In fact, the Darter agreement dated August 20, 1985, at the bottom of page 1, specifically acknowledges that the name "Shoney's" enjoys a reputation which has a unique benefit and value to the plaintiffs herein and their licensees.

 Granted, there is no direct competition between the defendants' running of a restaurant and Darter's lodging facility, but this absence of competition is not a bar to relief where there is a likelihood that the public will be confused. *AMP, Inc. v. Foy,* 540 F.2d 1181, 1183 (4th Cir.1976). Whether direct competition exists is but one of the factors to be considered in answering whether there is a likelihood of confusion. *Continental Motors Corp. v. Continental Aviation Corp.,* 375 F.2d 857, 861 (5th Cir.1967). Among the many other factors which the court may consider are the strength of the first mark, the degree of similarity between the marks, the proximity of the services, the likelihood that the holder of the second mark will bridge the gap, the actual confusion, the good faith of the holder of the second mark, the quality of the second holder's product, and the sophistication of the buyers. *See Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2nd Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *see also Marcon, Ltd. v. Helena Rubenstein, Inc.,* 694 F.2d 953, 955–56 (4th Cir. 1982); *Fleishmann Distilling Corp. v. Maior Brewing Co.,* 314 F.2d 149 (9th Cir.), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963). This is not an exhaustive list of the possible variables as the court may have to take other factors into consideration. *Polarad,* 287 F.2d at 495.

 In examining the confusion question both the restaurant and lodging facility use the same word, "Shoney's." The only difference is that the latter adds the word "Inn," a word which Shoney's–Tennessee disclaimed as to its exclusive use when the trademark was obtained. Defendants' Exhibit 4 is a picture of the Shoney's sign in front of one of the defendants' restaurants. The word Shoney's appears in white, rounded letters on a red background. The sign is in the shape of a rectangle with each of the four corners cut out, leaving a circular indentation where the corner would be in a regular rectangle.

Defendants' Exhibit 2 shows the sign in front of Darter's Shoney's Inn in Williamsburg. This sign is virtually identical to the Shoney's sign. The only difference is that the word "Inn" appears below the word Shoney's, and therefore the sign is a little larger in area and closer to being square in shape to accommodate the extra word. The style of lettering, color scheme, and circular indentation on the corners is the same. There was also testimony that the two looked identical or very similar. Obviously, the public will associate the suppliers of two vital needs, food and shelter, under the same Shoney's name to be one and the same.[3]

---

3. Testimony at trial showed that a Shoney's restaurant is generally situated adjacent to each Shoney's Inn, which would lead the public to believe the two are associated if someone entering the Tidewater area had seen the two together in another location. Also, posters advertising Shoney's Inns appear in Shoney's restaurants throughout the Tidewater area. These facts bolster the court's conclusion that the public will associate Shoney's restaurants and Shoney's

Although factually confusion seems to exist in this case, there is a threshold question as to whether the defendants have standing to assert a claim of infringement under 15 U.S.C. § 1114 that must be addressed before determining if confusion exists as a matter of law. Section 1114 provides for a "registrant" to bring a civil action for an alleged trademark infringement. The term registrant includes the legal representatives, predecessors, successors and assigns of the registrant. 15 U.S.C. § 1127 (1982). Unless the defendants meet the definition of a registrant, they lack standing to assert a cause of action under section 1114. *DEP Corp. v. Interstate Cigar Co.* 622 F.2d 621 (2nd Cir.1980).

In *DEP* the Second Circuit addressed the question of the alleged infringement of the trademark "Pears" used on a translucent bar of soap. A. & F. Pears Ltd., an English corporation, owned the trademark which was registered in the United States. Unilever Export Ltd. ("Unilever"), another English corporation, owned the exclusive right to distribute Pears Soap in the United States. On July 1, 1978, Unilever contracted with DEP Corporation (DEP), a California corporation, naming DEP as Unilever's exclusive distributor of Pears Soap in the United States. Not long after entering into this agreement DEP became apprised of the fact that Interstate Cigar Company, Inc. ("Interstate") and L.S. Amster & Company, Inc. ("Amster") were selling Pears Soap in the United States, which had been obtained through European middlemen. *Id.* at 621.

DEP's claim of trademark infringement was dismissed based upon the finding that DEP lacked standing as it did not own the trademark. The court found that whatever interests DEP had in the matter were governed by its agreement with Unilever. Since the agreement did not reach the level of an assignment, DEP did not meet the definition of a registrant. *See id.* at 622–23.

The Second Circuit took a different position in the earlier case of *G.H. Mumm*

Inns. The plaintiffs have never contended that there was no similarity between the two, but

*Champagne v. Eastern Wine Corp.*, 142 F.2d 499 (2nd Cir.), *cert. denied,* 323 U.S. 715, 65 S.Ct. 41, 89 L.Ed. 575 (1944). *Mumm* involved the registration by a French corporation of two trademarks in the United States for wines marketed under a specific label. The French company organized a Delaware corporation in 1933 and owned fifty-three percent of its common stock and all of its preferred stock. In 1938 the two companies entered into a contract whereby the French company agreed to sell its wines in the United States only to the Delaware corporation. This contract provided that the French company would protect and enforce all trademark rights in the United States, while the Delaware corporation was required to inform the French company of any possible infringement. *Id.* at 500–01.

The Delaware corporation brought suit against a New York corporation on its own behalf for unfair competition and on behalf of the French company for trademark infringement. *Id.* at 500. The existing war prevented the French company from personally appearing in court. The court determined that it was not necessary to have the trademark owner present because the Delaware company had its own interest due to its monopoly right to sell the wine in the United States. Thus, the court allowed the licensee to proceed with the infringement action. *Id.* at 502.

The *DEP* court distinguished *Mumm* on four grounds. First, the *Mumm* case was handed down before the Lanham Act became effective so the definition and requirement of a registrant was not applicable. Second, the French company was not a party due to its alien status in World War II and it owned fifty-three percent of the Delaware corporation defending the marks. Third, the Delaware corporation had been designated as the party upon whom process was to be served in proceedings affecting trademark ownership. Fourth, and finally, both the *Mumm* and the *DEP* contracts had clauses whereby the licensee was to notify the licensor of any potential

only that the issue of the likelihood of confusion should not be considered in this case.

infringement. But, unlike the clause in *Mumm,* the *DEP* contract stated explicitly that DEP had no claim or right whatsoever in the trademark involved. *DEP,* 622 F.2d at 623.

This court must determine whether to follow *DEP* or *Mumm* in deciding the case at bar. At least one court has distinguished *DEP* on the grounds that the *DEP* contract explicitly stated that the plaintiff had no interest whatsoever in the trademark and that the trademark owner would handle the infringement suits. *Business Trends Analysts v. Freedonia Group, Inc.,* 650 F.Supp. 1452, 1458 n. 25 (S.D.N.Y. 1987) (discusses *DEP* but does not involve a section 1114 claim). In the case at bar, unlike the contract in *DEP,* the defendants were given a right in the mark, i.e., the defendants have the "exclusive right to use the Shoney's System, Trade Names and Marks . . .," along with "the exclusive right to use the menus, recipes and formulas and products provided or developed by Licensor within the Licensed territory." 1984 Agreement at 3. There is also a provision in the 1984 Agreement for cooperation between the licensor and licensee in protecting the trademark in Section I, paragraph 9. Since the defendants seem to have some rights to protect, they do in fact have standing in light of *Mumm* and *DEP* (as distinguished).

The Schoenbaum's standing is to bring suit against an infringer, but the next question is whether the exclusive licensee has standing to sue the registrant/licensor of the trademark. This exact question was addressed by the court in *Silverstar Enterprises, Inc. v. Aday,* 537 F.Supp. 236 (S.D. N.Y.1982). Plaintiff, Silverstar Enterprises, Inc. ("Silverstar"), entered into a licensing agreement with defendant, Marvin Lee Aday, known professionally as "Meat Loaf," a performing and recording artist of international stature, and defendant Meatloaf Enterprises, Inc. ("MLE"), the stock of which is owned principally by Aday. This license agreement granted Silverstar the exclusive worldwide license for five years to use the name and registered trademark "MEAT LOAF" on various paraphernalia such as clothing and marketing rights to

the same. Subsequently, Silverstar brought suit alleging a trademark infringement by the licensors in engaging another party to market merchandise on an upcoming European tour. *Id.* at 237–38.

After discussing the *DEP* and *Mumm* decisions, the court concluded that the pronouncement in *DEP* "may be controlling in this case." *Id.* at 240. This conclusion was based upon a clause in the lease in which the licensor retained ownership of the marks: " 'Licensee and all parties to this Agreement acknowledge the Licensor's exclusive right, title and interest in and to the Service Marks, Trademarks and/or Copyrights. . . .' " *Id.* The court then goes on to analyze the question of standing in a suit for infringement brought by the licensee against the licensor on the assumption that Silverstar did have standing. At the outset the court noted that there did not appear to be any reported cases on this point. *Id.* at 239. The court found that:

> Even assuming Silverstar has standing to maintain an infringement action under § 1114, it does not have standing to maintain such an action against the registrant. MLE, as the registrant of the mark MEAT LOAF, has the right to sue for trademark infringement according to the terms of § 1114. Silverstar's interest in the trademark arises solely from the contractual relationship between it and MLE, and such interest is secondary to the registrant's. Any right Silverstar may have to sue under the Lanham Act, *a fortiori,* is derivative of the rights of the registrant MLE. Therefore, in the present case, Silverstar's only standing under the Lanham Act would be on behalf of Meat Loaf [Aday] and MLE to enforce the trademark owner's proprietary rights.

> In this action, Silverstar is not attempting to enforce the registrant's proprietary rights. Rather, the licensee Silverstar is attempting to enforce its own rights under the License agreement. This is a contract dispute and should be brought under a contract theory. Such a suit cannot properly be maintained as a

trademark infringement action under § 1114.

*Id.* at 240–41.

The only case to discuss *Silverstar* is *Burma–Bibas, Inc. v. Excelled Leather Coat Corp.*, 584 F.Supp. 1214 (S.D.N.Y. 1984). In *Burma–Bibas*, the plaintiff Burma–Bibas, Inc. ("B–B") manufactured men's clothing under an exclusive license agreement with defendant Oleg Cassini, Inc. ("OCI") for the use of the trademark "Oleg Cassini." This exclusive licensing agreement was entered in 1975. Then, in the spring of 1982 Excelled Leather Coat Corp. ("Excelled") began selling clothing with the Oleg Cassini trademark after receiving authorization from OCI. B–B brought suit against Excelled and OCI alleging, among other things, that the defendants infringed upon its trademark rights which would result in the likelihood of confusion. *Id.* at 1216.

Excelled moved to dismiss the infringement count on the grounds that no infringement had been shown. Relying on *Silverstar*, Excelled conceded that there might be a contract violation but not an infringement action under the Lanham Act supporting federal jurisdiction. *Id.* The *Burma–Bibas* court did not attack the *Silverstar* standing analysis, but looked to the Silverstar court's dismissal for failure to state that any confusion would result. Excelled's motion to dismiss was denied because the court concluded that confusion was sufficiently alleged. *Burma–Bibas*, 584 F.Supp. at 1217. The *Silverstar* standing analysis was left unscathed.

The rationale of *Silverstar* is very persuasive. Although the Schoenbaums have been granted the exclusive right to the trade name Shoney's in the Tidewater area, and this court has concluded that the defendants have a protectable right in the trade name, that right is derivative of Shoney's–Tennessee's registration of the mark. Any standing that the defendants have to assert infringement is on behalf of the "registrant" Shoney's–Tennessee. As in *Silverstar*, the licensee, Schoenbaums, are attempting to enforce their own rights under the 1984 Agreement. The result is that

this is a contract action rather than a trademark infringement action under section 1114. Since the defendants lack standing, the court concludes that there is no infringement cause of action available to the licensee, Schoenbaums, against the licensor under section 1114. The Court is not called upon to determine the rights of the defendants against Darter who is not a party to this action, but who knew of the limitations on the use of the name "Shoney's" at the time he negotiated with plaintiffs as to "Shoney's Inn."

Defendants argue that standing is not an issue since the plaintiff-registrant, rather than the defendant-licensee, brought the suit. The defendants, however, ignore the fact that this suit is for declaratory relief pursuant to 28 U.S.C. § 2201 (Supp.1985) (Declaratory Judgment Act), and not a direct cause of action for trademark infringement under section 1114.

Judicial power is limited by the Constitution to "cases" and "controversies." U.S. Const. art. III, § 2. Only "cases of actual controversy" may be adjudicated under the Declaratory Judgment Act. 15 U.S.C. § 2201. Congress did not broaden the jurisdiction of the federal courts by passing the Declaratory Judgment Act, but rather provided a new procedural device for handling controversies over which the courts already had jurisdiction. *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 239–40, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). The purpose of a declaratory judgment is to avoid the accrual of damages which possibly could be avoided by one who is not certain of the full nature of his rights and to allow him a forum to adjudicate such rights instead of waiting for his adversary to file suit. It allows the parties to prevent violations of their rights by clarifying their legal relationships. *Travelers Insurance Co. v. Davis*, 490 F.2d 536, 543 (3rd Cir.1974).

The plaintiff's complaint alleges:

The matters at issue between the parties involve an actual controversy relating to allegations of actual or threatened violation of federal laws, including, but not limited to, 15 U.S.C. § 1114....

They are asking the court to determine their liability under section 1114, i.e., what can the defendants recover from them for a possible infringement under section 1114. This court has held that the plaintiffs would not be liable to the defendants under section 1114 as the defendants do not have standing to bring such a cause of action. To follow defendants' argument that standing is not an issue since the licensor filed the declaratory action would render meaningless part of the purpose of the declaratory judgment. As stated in *Travelers*, a purpose of a declaratory judgment is to allow a party to determine his rights rather than waiting for his adversary to file suit. If the licensors cannot argue standing since they filed the declaratory action, then a future plaintiff in the same situation will have to wait for his adversary-licensee to bring suit in order to allege lack of standing. This would defeat one of the purposes of the Act. In essence, the defendants are asking this court to look at the declaratory judgment as a cause of action rather than as a vehicle to determine the rights of the parties simply because the licensor brought the action. Defendant's argument on this issue is without merit.

### B. *Unfair Competition*

Defendants have also made an unfair competition claim pursuant to 15 U.S.C. § 1125(a) (1982). That section provides for "any person who believes that he is or is likely to be damaged ..." to bring a Lanham Act suit. *Id.* Unlike section 1114, a *user* of a mark has standing to assert an unfair competition claim—section 1125(a) does not require the owner to file the suit. *Silverstar*, 537 F.Supp. at 241. "[O]ne who may suffer adverse consequences from a violation of section 1125(a) has standing to sue regardless of whether he is the registrant of a trademark." *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 160 (1st Cir.1977).

A section 1125(a) case with an almost identical set of facts to the present case is *Ballet Makers, Inc. v. United States Shoes Corp.*, 633 F.Supp. 1328 (S.D.N.Y.1986). United States Shoe Corporation ("U.S. Shoe") owned title to the trademark "CA-PEZIO." On February 13, 1974, U.S. Shoe granted Ballet Makers, Inc., "the exclusive, nontransferrable [sic] license to use the trademarks 'CAPEZIO' solely in connection with the manufacture, sale and distribution of [dance and recreational footwear and accessories, including, but not limited to 'tights'] through dance footwear outlets." *Id.* at 1329. Ten years later U.S. Shoe entered a licensing agreement with J.P. Manning, Inc. ("Manning"), granting "the exclusive and non-transferable [sic] right and license ... to use the trademark 'CA-PEZIO' ... on and in connection with the manufacture, distribution and sale of designated articles of hosiery [including girls and womens tights]." *Id.* at 1329–30. Ballet Makers sued U.S. Shoe for trademark infringement and unfair competition pursuant to sections 1114 and 1125(a), respectively. *Id.* at 1330.

The court found that the law of trademark infringement is but a part of unfair competition and that the basis of liability is same for both actions—consumer confusion. *Id.* at 1330–31 (*citing American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 664 (2nd Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *Mushroom Makers, Inc. v. R.G. Berry Corp.*, 441 F.Supp. 1220, 1225 (S.D.N.Y.1977), *aff'd*, 580 F.2d 44 (2nd Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). The court found that the same set of facts supported both causes of action and, therefore, failure to establish a confusion of source for unfair competition will necessarily result in the failure of the infringement claim. *Id.* at 1331. Since the court ultimately found that the licensee could not maintain the action against the licensor, it avoided the standing issue under section 1114 and the *Silverstar* decision.

The court analyzed the confusion concept and found that it refers to " 'the public's belief that the mark's owner sponsored or otherwise approved the use of the trademark.' " *Ballet Makers*, 633 F.Supp. at 1334, *quoting Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2nd Cir.1979). "A trade-

mark informs the public of a source of the goods and assures them of its quality." *In re Polar Music International AB,* 714 F.2d 1567, 1571 (Fed.Cir.1983) (quoted in *Ballet Makers,* 633 F.Supp. at 1334). The *Ballet Makers* court held that the "source" of the goods is the person who controls the quality. *Ballet Makers,* 633 F.Supp. at 1334 n. 5. U.S. Shoe maintained the control of the quality and was the source of both CAPEZIO goods manufactured by Ballet Makers and Manning. Manning's license even stated that the control of the quality of the goods was retained by U.S. Shoe. The court concluded that the licensee could not maintain a Lanham Act cause of action because as a matter of law no confusion could exist. *Id.* at 1335.

This court has found that factually the two marks are confusingly similar. As a matter of law, however, the question of confusion boils down to whether there is a common source which controlled the quality of the services. In the Shoney's Inn License Agreement between Shoney's Lodging and Darter, the licensee warranted "to provide efficient, courteous and high-quality service to the public, consistent with a first-class budget motel and other Shoney's Inn System units." All items of merchandise equipment, and supplies bearing the Shoney's Inn name must be submitted and receive the approval of Shoney's Lodging. Also, the licensee must "maintain the Premises, and all buildings, fixtures, furnishings, signs, and equipment therein, in conformity with Licensor's then-current standards...." Shoney's Inn License Agreement at 5, 6.

It is readily apparent from the contract that Shoney's Lodging maintained control of the services offered and associated with Shoney's Inn. Likewise, Shoney's—Tennessee has retained control of the quality of the services offered by Shoney's restaurants. The 1984 Agreement provides that the licensees shall "[o]perate all restaurants and prepare and sell all products sold therein in accordance with the specifications, standards, business practices and policies of Licensor now in effect or hereafter promulgated by Licensor for its licensees, and comply with all requirements of the Shoney's System as they are now or hereafter established." 1984 Agreement at 6.

Under the *Ballet Makers* analysis there can be no confusion here because the source of the goods is the same, and confusion can only result if the consumers are confused as to the source. Defendants attempt to distinguish *Ballet Makers* by arguing that there is no common source since Shoney's Lodging owns the Shoney's Inn trademark, and Shoney's–Tennessee has title to the Shoney's trademark. Defendants fail to mention the fact that Shoney's Lodging is a wholly-owned subsidiary of Shoney's Tennessee, which provides the requisite common source for maintaining the quality of Shoney's and Shoney's Inn services. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1983) ("[I]n reality a parent and a wholly owned subsidiary *always* have a 'unity of purpose or a common design.' They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests."). Since there can be no confusion as a matter of law, defendants have no Lanham Act cause of action for unfair competition. Thus, even if the defendants had been found to have standing for a section 1114 suit, they still could not proceed under the Lanham Act as there is no confusion within the legal definition.

### 3. *Breach of Contract*

■ As the court in *Silverstar* noted, this type of case, where the exclusive licensee wishes to proceed against the licensor, is nothing more than a contract dispute. The court in *Silverstar,* however, had only federal question jurisdiction and could not consider the breach of contract question after the Lanham Act claims were dismissed. *Silverstar,* 537 F.Supp. at 242. This court has jurisdiction under diversity of citizenship and, therefore, may consider the breach issue.

Shoney's–Tennessee granted the Schoenbaums "the exclusive right to use the Shoney's System, Trade Names and

Marks within the Licensed Territory...." 1984 Agreement at 2. "[T]he distinguishing features of the Shoney's System, include but are not limited to, the name 'Shoney's'...." 1984 Agreement at 1. As defined in Black's Law Dictionary 507 (5th ed. 1979), an "exclusive right" is "one which only the grantee thereof can exercise, and from which all others are prohibited or shut out." The term "exclusive" means "[a]ppertaining to the subject alone, not including, admitting, or pertaining to any others. Sole. Shutting out; debarring from interference or participation; vested in one person alone." *Id.* at 506; *see also Industrial Equipment Co. v. Emerson Electric Co.*, 554 F.2d 276, 286 (6th Cir. 1977) (quoting Black's definition of "exclusive" from 4th ed.).

The court concluded *supra* that the Schoenbaums were granted only the right to open and operate restaurants and nothing else. This protects the licensor from the Schoenbaums using the name Shoney's on anything but a restaurant—not on grocery stores, dry cleaners, motels or any other type of establishment. The Schoenbaums as licensees were given a similar protection. They were granted the exclusive right to the name Shoney's in the Tidewater area, as the name Shoney's is a part of the Shoney's System. This in turn prohibits the licensor from granting the use of the name Shoney's, or using the name themselves, on any other establishment in the Tidewater area. Thus, the licensee is assured that no other uses of the word will be made in the Tidewater area which would cause injury to or derive benefit from the established goodwill of the Schoenbaums.[4]

After granting the Schoenbaums this exclusive right to use the name Shoney's, Shoney's–Tennessee, through Shoney's Lodging, granted Darter the right to use the name "Shoney's Inn." Merely adding the word "Inn" in the grant does not change the fact that the word Shoney's is being used by Darter. The Schoenbaums contracted for the exclusive right to use the word Shoney's in the Tidewater area and Shoney's–Tennessee granted the same. Although different trademarks are involved, this is not a Lanham Act question but merely an issue of contract interpretation. Shoney's–Tennessee could have easily required a clause excluding Shoney's Inns from the exclusivity of the right to the name Shoney's in the 1984 Agreement. (The Shoney's Inn trademark was registered two years earlier in 1982). Whether this was good business judgment on the part of Shoney's–Tennessee is not a question for the court. The role of the court is to interpret the rights and obligations of the parties from the face of the totally integrated contract. Therefore, the court concludes that Shoney's–Tennessee granted the Schoenbaums the exclusive right to the name Shoney's in the Tidewater area, that Shoney's–Tennessee's subsidiary corporation granted Darter the use of the name Shoney's Inn on a motel in the Tidewater area, and that the grant to Darter was a breach of the 1984 Agreement by Shoney's–Tennessee.

### DAMAGES—INJUNCTION

The Court, as it interprets the pleadings, is not called upon to fix any damages in favor of the defendants for the breach of the contract between Shoney's–Tennessee and the defendants. Reaching a monetary damage may be next to impossible as, strictly speaking, a restaurant is noncompeting with a lodging facility as, contrary to the rule with competing facilities, " 'the assumption cannot be made that the ...

---

**4.** Defendant Leon Schoenbaum opened his first Shoney's restaurant in the Tidewater area in 1955 at Hampton, Virginia, pursuant to an agreement with Parkette Commissary, Incorporated, which originally owned the Shoney's trademark. That restaurant is still in operation and the defendants have since opened ten others in the Tidewater area. Seemingly, some goodwill would have developed in the name Shoney's since 1955. Also, in the "Shoney's Inn License

Agreement" between plaintiff Shoney's Lodging, Inc., and William I. Darter (Plaintiffs' Exhibit 7), the name "Shoney's" is said to have a reputation with a "unique benefit and value." The court declines to place any specific monetary value on the goodwill of the defendants' restaurants, but is merely pointing out that there is goodwill from which benefit could be derived or to which injury could be caused.

**568**

profits constitute a fair measure of the ... loss, for the ... sales are not diverted.' " Restatement (First) of Torts § 747 comment g (1938) *quoted in Quabaug,* 567 F.2d at 162. It is possible that damages may be shown in considering royalties, but the evidence presented does not show what amount, if any, the plaintiffs received from Darter and, as noted, Darter is not a party to this action.

 As to the issuance of an injunction order, while there is considerable discretion accorded the district judge, the principles of *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189 (4th Cir. 1977), are basically controlling. The two more important factors are those of probable irreparable injury to the aggrieved party without an injunctive decree, and of the likely harm to the party liable with a decree against him. It is necessary to consider a balancing test, always bearing in mind the public interest. *Id.* at 186.

Irreparability of harm is met since it includes the "impossibility of ascertaining with any accuracy the extent of the loss," *id.* at 197, which the court has concluded is present in this case. The second factor, likely harm to Shoney's–Tennessee, is negligible as the licensor has a right under the agreement with Darter to require the use of new marks in lieu of previously designated marks. Shoney's Inn License Agreement at 4. Likewise, the restriction from licensing any other entity to use the Shoney's name in connection with an inn has only a minor impact—a problem created by Shoney's–Tennessee itself in the 1984 Agreement. Shoney's–Tennessee, as licensor under the 1984 Agreement, has a duty of forebearance, i.e., a duty not to use or grant the use of the name Shoney's to anyone else in the Tidewater area. In such a situation the court has the discretion to issue an injunction "against a party who has committed or is threatening to commit a breach of duty." Restatement (Second) of Contracts § 357(2) & comment b, illustration 4 (1981).

If plaintiffs would agree to use a different name on the Shoney's Inn at Williamsburg and not to attempt to license any more inns in the Tidewater area during the life of the 1984 Agreement or any extension thereof, there would be no need for an injunction. The Court suspects that both parties wanted a determination of their rights under the agreements and, once finally concluded, there would be no necessity for an injunction. However, these understandings are not confirmed by the parties and, accordingly, an injunction will issue against the plaintiffs enjoining them from any further contractual breach with respect to the use of the name "Shoney's" within the restricted territory reserved for the Schoenbaums, and further providing that the sign "Shoney's Inn" shall be changed to some name not involving the use of the name "Shoney's" within sixty (60) days following the entry of a final judgment, unless the case is appealed in which event the name shall be changed within thirty (30) days following the receipt of the mandate if the decision is affirmed.

Each party will bear their own costs. Counsel for defendants will, after conferring with counsel for plaintiffs, present a final judgment order. If the parties to waive the expense of a corporate surety, the cost of which is taxed as costs, this will be agreeable with the Court.