UNITED STATES HOSIERY CORPO-
RATION and Workforce,
Inc., Plaintiffs,

v.

THE GAP, INC., Defendant.

No. ST–C–87–136.

United States District Court,
W.D. North Carolina,
Statesville Division.

Feb. 13, 1989.

See also, D.C., 707 F.Supp. 795.

W. Thad Adams, III, Jeffrey J. Davis, Moore & Van Allen, Charlotte, N.C., for plaintiffs.

Martin R. Greenstien, Baker & McKenzie, Chicago, Ill., John H. Hasty, Waggoner, Hamrick, Hasty, Monteith, Kratt, Cobb & McDonnell, Charlotte, N.C., for defendant.

## MEMORANDUM AND ORDER

ROBERT D. POTTER, Chief Judge.

### I. PRELIMINARY STATEMENT

THIS MATTER is before the Court on (1) Defendant's Motion for Summary Judgment, filed September 27, 1988, (2) Plaintiffs' Motion for Partial Summary Judgment, filed September 27, 1988, and (3) Plaintiffs' Further Motion for Partial Summary Judgment, filed October 11, 1988.

On October 24, 1988, a hearing on these motions was held, the undersigned presiding.[1] Attorneys W. Thad Adams, III, and Margaret Ann Behringer appeared at the hearing on Plaintiffs' behalf, and attorneys John H. Hasty, Martin R. Greenstein, and Phil Zadeik appeared on Defendant's behalf. After hearing counsel's arguments, the undersigned took the outstanding motions under advisement.

For the reasons set forth below, this Court will (1) grant in part and deny in part Defendant's Motion for Summary Judgment, (2) dismiss Plaintiffs' Third Claim for Relief, (3) deny Plaintiffs' Motion for Par-

---

1. At the October 24th hearing, this Court also heard the parties' arguments on (1) Defendant's Motion to Set Trial for a Date Certain in the Court's October Term, filed September 13, 1988, (2) Defendant's Motion for Protective Order, filed September 13, 1988, (3) Defendant's Motion for Protective Order, filed September 14, 1988, (4) Plaintiffs' Motion to Compel Production of Documents and for Sanctions and Damages, filed September 19, 1988, (5) Defendant's Motion to Compel, filed September 20, 1988, and (6) Plaintiffs' Motion for Peremptory Trial Setting, filed September 20, 1988. This Court disposed of these motions by a separate order, filed December 21, 1988, 707 F.Supp. 795.

tial Summary Judgment, (4) grant Plaintiffs' Further Motion for Partial Summary Judgment, and (5) dismiss Defendant's Counterclaim.

## II. NATURE OF THE CASE

This is essentially a trademark case arising under federal trademark laws, 15 U.S.C.A. §§ 1051–1127 (West 1976, 1982 & Supp.1988), with pendent state claims for unfair trade practices and common law trademark infringement. This Court's subject-matter jurisdiction rests upon 28 U.S.C.A. §§ 1331 & 1338(a), (b) (West 1976 & Supp.1988), and 15 U.S.C.A. § 1121 (West Supp.1988).

Plaintiffs are seeking relief under five separate causes of action: First Claim for Relief, trademark infringement of Plaintiffs' registered trademark "WORKFORCE" (Reg. No. 1,156,470), pursuant to 15 U.S.C. § 1114; Second Claim for Relief, false designation of origin, pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); Third Claim for Relief, false or fraudulent registration; Fourth Claim for Relief, unfair trade practices, N.C.Gen. Stat. § 75–1.1; and Fifth Claim for Relief, common law trademark infringement. Plaintiffs are seeking injunctive relief, monetary damages, punitive damages, an accounting of Defendant's sales and profits, destruction of all allegedly infringing labels, tags, packages, etc. bearing the "WORKFORCE" mark, and costs and attorney's fees. Plaintiffs have demanded a jury trial on all issues triable to a jury.[2]

Defendant has answered Plaintiffs' allegations by denying them, in general, and by raising seven affirmative defenses, including, inter alia, an assertion that The Gap's use of the "WORKFORCE" mark on its products in its company-owned stores, in conjunction with its logos, precludes any likelihood of confusion. Defendant has also counterclaimed seeking the cancellation of Plaintiffs' "WORKFORCE" mark, Reg. No. 1,156,470. Defendant is seeking

consequential damages, costs, and attorney's fees.

Defendant has moved for summary judgment on all of Plaintiffs' claims for relief. Plaintiff has moved for summary judgment on Defendant's counterclaim and Defendant's Third Affirmative Defense, which alleged the invalidity of Reg. No. 1,156,470.

## III. SUMMARY JUDGMENT STANDARD OF DECISION

Rule 56(c) of the Federal Rules of Civil Procedure establishes the standard of decision this Court must use when determining the present motions for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

Recently, the United States Supreme Court has had several occasions to construe the summary judgment standard established in Rule 56. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (antitrust conspiracy case); *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (libel action); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (asbestos related wrongful death action); *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1969) (alleged conspiracy to violate civil rights). These cases provide substantial guidance to this Court in its determination of the present motions for summary judgment.

In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106

---

**2.** The equitable issues will be determined by this Court after a jury has had an opportunity to determine the legal issues. *See, e.g., Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477, 82 S.Ct. 894, 899, 8 L.Ed.2d 44 (1962) (An action for damages for trademark infringement is cognizable by a court of law, and when it is joined with an equitable cause of action the legal issues should be tried by a jury first to preserve litigant's right to jury trial.).

S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court noted:

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

*Id.* 106 S.Ct. at 1356 (emphasis in original; footnote and citations omitted; quoting Fed.R.Civ.P. 56).

Stated another way, it is the moving party's burden to show that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Magill v. Gulf & Western Indus., Inc.*, 736 F.2d 976, 979 (4th Cir.1984); *Polo Fashions, Inc. v. Gordon Group*, 627 F.Supp. 878, 886 (M.D.N.C.1985). If that burden has been met, then the non-moving party must establish that there are indeed genuine issues of material fact; usually this is done by producing affidavits of persons with personal knowledge setting forth specific information to be offered at trial.

In *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court stated the following:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Id.* 106 S.Ct. at 2552–53; *accord White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir.1987).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; Rule 56 requires that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he substantive law will identify which facts are material." *Id.*

It is worth noting that in *Anderson v. Liberty Lobby, Inc.* the Court held:

> [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* 106 S.Ct. at 2511. On the other hand, all reasonable favorable inferences from the pleadings and depositions are to be drawn in favor of the party opposing the motion for summary judgment. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *White*, 820 F.2d at 101.

■ Summary judgment is not a disfavored procedural shortcut; instead, it is a useful method for disposing of issues, or even cases, in a just, speedy, and inexpensive way. *See, e.g., Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed.Cir.1987); *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.*, 582 F.Supp. 551, 554 (N.D.Ill.1984). "Summary judgment is as appropriate in a trademark infringement case as in any other case and should be granted or denied on the same principles." *Polo Fashions, Inc. v. Gordon Group*, 627 F.Supp. 878, 886 (M.D.N.C. 1985) (citing *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1086 (6th Cir.1983)); *see Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 147–149 (4th Cir.1987) (affirming grant of summary judgment to holder of trademark on issue of liability because "likelihood of confusion was so unassailably established"); *see also Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 116 (2d Cir.1984) (affirming grant of summary judgment to alleged trademark infringer); *Victory Pipe Craftsmen,*

*Inc. v. Faberge, Inc.*, 582 F.Supp. 551 (N.D. Ill.1984) (granting, in trademark case, defendants' motion for summary judgment). Summary judgment in a trademark case is appropriate if the court is satisfied that the products or marks are so dissimilar (or similar) that no genuine issue of material fact is presented. *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d at 116.

## IV. STATEMENT OF FACTS [3]

### A. *Plaintiffs*

Plaintiff United States Hosiery Corporation ("U.S. Hosiery") is a corporation organized under the laws of the State of North Carolina. U.S. Hosiery resulted from the December 22, 1986 merger of (1) Rudin & Roth, Inc., (2) another corporation named United States Hosiery Corporation, which was a Delaware corporation, (3) Superstar Hosiery, Inc., (4) Homespun Hosiery Mill, Inc., and (5) United States Hosiery Merger Corporation.[4] U.S. Hosiery has a place of business within the Statesville Division of this District.

Plaintiff Workforce, Inc. ("Workforce"), a corporation organized under the laws of the State of North Carolina, merged into U.S. Hosiery on January 22, 1988. For the sake of convenience, throughout this Memorandum and Order this Court will refer to Plaintiffs and their corporate predecessors simply as "Plaintiffs," unless the context otherwise requires.

Plaintiffs manufacture and market socks.

### B. *Plaintiffs' Mark and Its History*

In 1978 and 1979, after extensive market research, Plaintiffs decided to pursue the market for quality hosiery products for the American worker.[5] Plaintiffs selected the "WORKFORCE" mark for these hosiery products to suggest an "image of rugged durability." [6] Originally, there were five styles of work socks for men marketed with the "WORKFORCE" mark. Those styles were successful, so the product line was extended into women's socks and then into socks which could be used for tennis, basketball, and other sports as well as with specialized work boots. Marketing efforts, however, remained directed primarily toward the blue collar worker. Many of the styles are adaptable to uses other than rough physical labor.[7]

The mark "WORKFORCE," Reg. No. 1,156,470, exists on the Principal Register. That registration issued in 1981 to a Delaware corporation, United States Hosiery. On June 5, 1986, Workforce, Inc., a North Carolina corporation, executed a Declaration of Use and Incontestability for the "WORKFORCE" trademark. On September 22, 1986, objections as to the Declaration of Use and Incontestability were raised because Workforce, Inc. did not appear to be the record owner of the trademark. On October 23, 1986, the United States Patent and Trademark Office received a letter indicating that on October 3, 1986, United States Hosiery Corporation, denominated as a North Carolina corporation, assigned Reg. No. 1,156,470 to Workforce, Inc. United States Hosiery Corporation, a Delaware corporation, has never assigned Reg. No. 1,156,470 to Workforce, Inc. At the time of the assignment from United States Hosiery to Workforce, Inc., a North Carolina corporation named United States Hosiery did not exist. As noted above, a North Carolina corporation named

---

**3.** It is interesting to note that in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court recognized that Rule 56 of the Federal Rules of Civil Procedure does *not* require the trial judge to make findings of fact, although a statement of facts may be helpful to a reviewing court. *Id.* 106 S.Ct. at 2511 & n. 6. Thus, this Court will provide, from its review of the entire record, a statement of facts, but such statement of facts is not intended to be exhaustive.

**4.** Plaintiffs' Response to Defendant's Interrogatory No. 2.

**5.** Brier Aff. at 2.

**6.** Brier Aff. at 2.

**7.** Brier Aff. at 3.

United States Hosiery did not come into existence until December 22, 1986.

Since 1979, Plaintiffs have used their "WORKFORCE" mark throughout the United States in thousands of retail outlets, including Sears, Roebuck & Co. ("Sears"), a well-known department store.[8] In 1987, Sears outlets accounted for nine of the ten retail outlets responsible for the highest volume of sales of Plaintiffs' "WORKFORCE" socks.[9] In Sears' stores, Plaintiffs' socks are sold in the work clothing section of the men's wear department.[10] Mannequins dressed in work clothing with tools and hard hats are commonly seen in this area of Sears.[11]

From 1982 to October 6, 1987, Plaintiffs have sold approximately 8,077,188 pairs of socks.[12] Plaintiffs have advertised their products nationally on television and radio, in magazines and newspapers, in store displays, on sock labels, and by brochures.[13]

In 1983, Plaintiffs sold to Buyer's Fair, in Erie, Pennsylvania, "WORKFORCE" marked clothing, other than socks, for thirty-one dollars and sixty-eight cents ($31.68). Again in 1987, Plaintiffs sold to Buyer's Fair another batch of "WORKFORCE" marked clothing, other than socks, for sixty-four dollars and fifty cents ($64.50).[14] These items of clothing included (1) men's work gloves, (2) men's and ladies' shirts, (3) men's and ladies denim pants, (4) denim jackets for either sex, (5) a men's hat, and (6) bandanas for either sex.[15] On August 31, 1987, Plaintiffs filed a trademark application in the United States Patent and Trademark Office for the mark "WORKFORCE" on clothing; that application is now pending.

## C. Defendant

Defendant, The Gap, Inc. ("The Gap"), is a California corporation with its principal place of business in San Bruno, California. The Gap has been in business since 1969, and its stock is publicly traded on New York Stock Exchange.[16] Defendant is a retail chain marketing, among other things, denim jeans, chambray shirts, and denim jackets. The Gap is the registered owner of several trademarks, including "GAP" and "THE GAP."

Defendant sells its goods in its company-owned and operated THE GAP stores, where it also sells Levi–Strauss products (jeans, shirts, skirts, jackets, etc.) and various other clothing lines of its own.[17] The Gap's company-owned stores are specialty stores with a bright, casual appearance.[18] Clothing bearing the "GAP" trademark or "THE GAP" trademark is not sold through any retail outlets other than The Gap's company-owned stores.[19] Many, but not all, of The Gap's company-owned stores are located in shopping malls.[20] The Gap's stores and its merchandise are designed to appeal to men and women of all ages, but the primary target audience is the 15–35 age group.[21] The Gap's customers appear to purchase its clothing for casual or leisure wear.[22]

---

8. Brier Aff. at Paras. 14, 15.

9. Plaintiffs' Response to Defendant's Interrogatory No. 5.

10. Clark Depo. at 8–16.

11. Quigley Aff. at 1.

12. Brier Aff. at 4, Exh. C.

13. Brier Aff. at 4.

14. Plaintiffs' Responses to Defendant's Interrogatories Nos. 6 & 7.

15. Plaintiffs' Response to Defendant's Interrogatory No. 8.

16. Sabol Aff.Exh. A. at 2.

17. Gross Aff. at 2.

18. Gross Aff. at 2; Gross Aff.Exh. A.

19. Gross Aff. at 2.

20. Rossner Aff. at Para. 6.

21. Gross Aff. at 2; Corsiglia Aff. at 3.

22. Corsiglia Aff. at 3 (type of clothing, the outfits of customers, why returns of clothing are made, and conversations with customers all lead to reasonable inference that customers buy clothing for casual and leisure wear).

## D. *Defendant's Mark and Its History*

In the late summer or fall of 1986, Millard Drexler, President of The Gap, asked Maggie Gross ("Gross"), Senior Vice President of Advertising for The Gap, to develop a new labeling program to replace the labels then in use on The Gap's own line of denim products.[23] This new labeling program would be used in conjunction with The Gap's "GAP" and "THE GAP" trademarks on its denim products. Since The Gap constantly adds new styles and fits to its denim product line, and discontinues others, the new labeling program had to be able to expand or contract to identify and describe the new styles and fits.[24]

Gross had a book entitled *Jobs of the Future: The 500 Best Jobs Where They'll Be and How to Get Them* [hereinafter *Jobs of the Future*], which provided to her the idea of using different jobs and professions to identify and describe different styles and fits of The Gap's denim products.[25] In August 1986, Gross' advertising group sought to develop a unifying "umbrella" designation, which could conceptually tie together the idea of using various jobs to identify a variety of styles and fits of The Gap's denim products.[26] The advertising group came up with the "WORK FORCE" umbrella designation, and they made several mock-ups of possible labels for The Gap's denim products.[27] Illustration number one, appended to this Memorandum and Order, is a photocopy of one such mock-up of a pocket flasher, which is a tag that is usually attached to the back pocket of a pair of jeans.[28] The Gap has not kept other "WORK FORCE" mock-ups; they have been destroyed.

In October 1986, after The Gap selected "WORK FORCE" as the umbrella designator for the new labeling program, Gross asked The Gap's Legal Department to conduct a search to clear the "WORK FORCE" mark for The Gap's use.[29] The Gap's Legal Department commissioned a trademark search from Thomson & Thomson, a commercial trademark firm that routinely conducts trademark availability searches. On November 4, 1986, The Gap's Legal Department received Thomson & Thomson's search results.[30]

On November 6, 1986, Joanne Garrison ("Garrison"), an attorney in The Gap's Legal Department, informed Gross that the "WORK FORCE" mark was available for use on The Gap's denim products.[31] Garrison also informed Gross of Plaintiffs' use of the "WORKFORCE" mark on hosiery and told her that, in Garrison's opinion, The Gap's use of "WORKFORCE" on its denim products, sold exclusively in conjunction with "GAP" or "THE GAP" marks in The Gap's company-owned stores, would not conflict with Plaintiffs' use of the "WORKFORCE" mark.[32]

Thereafter, Gross tried to develop a "WORK FORCE" labeling program for use on labels, flashers, and hang-tags, but she eventually turned the project over to Marke Communications ("Marke"), a creative advertising agency located in New York, because the material she developed in-house did not have the look and feel she wanted.[33] Gross told Marke's creative people that she wanted humorous, tongue-in-cheek, graphics and text for the labeling program, which would evoke the 50's era in

---

**23.** Gross Aff. at 2.

**24.** Gross Aff. at 2–3.

**25.** Gross Aff. at 3; Gross Aff.Exh. B (title page, table of contents, and relevant excerpts from *Jobs of the Future*).

**26.** Gross Aff. at 3.

**27.** Gross Aff. at 3–4; Gross Aff.Exh. C (a copy of Exh. C. is appended to this Order as Illustration One).

**28.** Elkan Depo. at 23. Flashers are intended to be removed from the product after purchase and before wearing. *Id.*

**29.** Gross Aff. at 4; Garrison Aff. at 2.

**30.** Garrison Aff. at 2; Garrison Aff.Exh. A.

**31.** Garrison Aff. at 2; Garrison Aff.Exh. B (memorandum memorializing the details of the November 6, 1986 meeting between Gross and Garrison).

**32.** Garrison Aff. at 2–3.

**33.** Gross Aff. at 5.

America.[34]

Marke successfully executed Gross' concept. From February 1987 to May 1987, Gross and her advertising department worked to complete development of the hang tags and flashers.[35] Illustrations two through seven, appended to this Memorandum and Order, are photocopies of these hang tags, labels, and flashers.

In April 1987, Gross received a label for Plaintiffs' "WORKFORCE" socks, and she sent the label to The Gap's Legal Department for their review.[36] Gross believed that Plaintiff's label had an impact different from The Gap's "WORK FORCE" labels.

In addition to the labeling program, Gross also developed for The Gap's "WORK FORCE" product line a print-media advertising program, which was to appear in various fashion and trendy magazines, including *Gentlemen's Quarterly, Elle, The Face, Interview, Rolling Stone, Glamour, M: The Civilized Male, Vogue,* and *Esquire.*[37] In contrast to the labeling program, the advertising program was intended to have a more serious tone, using a series of photographs from the 1930's, taken by Dorothea Lange and Jack Delano, along with photographs of models wearing The Gap's "WORK FORCE" clothing.[38]

The Gap's products appear with labels that have two variations of the "WORK FORCE" mark: "WORKFORCE" (a single formation) and "WORK–FORCE" (hyphenated).

Since The Gap began using the "WORK FORCE" mark, there appears to have been at least one instance of actual confusion between The Gap's "WORK FORCE" product line and Plaintiffs' "WORKFORCE" socks.[39]

### E. *Third Parties & The Barco/Gap Agreement*

The marks "WORK FORCE" and "WORKFORCE" have been used on, registered for, a variety of products and services, other than the parties' products, including water faucets and valves, material cutting machines, hydraulic power units and hydraulic pumps, furniture parts and fittings, disposable wipers, trade union newsletters, and computer programs on magnetic media.[40] In conjunction with other words, the words "work force" have also been used as part of the service marks for a laundry service, three temporary employment services, and a management consulting service.[41] Separately, the words "work" and "force" have been used in conjunction with various other words to form

**34.** Gross Aff. at 5; Elkan Depo. at 20–21, 28–33, Exh. 2A.

**35.** Gross Aff. at 6; Gross Aff.Exh. D (copies of Gross Aff.Exh. D are appended to this Order as Illustrations numbers two through eleven).

**36.** Gross Aff. at 6.

**37.** Gross Aff. at 7; Gross Aff.Exh. E (copies of WORK FORCE advertisements appearing in various magazines).

**38.** Gross Aff. at 7; Elkan Depo. at 33.

**39.** Ralph Clark, a buyer for Sears, testified at his deposition that he was "shocked" when he learned that the "WORKFORCE" mark was being placed on The Gap's products because he thought Sears had an exclusive agreement with one of Plaintiffs' corporate predecessors regarding the use of "WORKFORCE" mark. In the next breath, however, Clark testified that he did not believe the products with the "WORK-FORCE" mark were somehow connected with

Plaintiffs or Plaintiffs' corporate predecessors. Clark Depo. at 35–36. A reasonable trier of fact considering Clark's testimony could reach different conclusions on its meaning.

On the other hand, Defendant has provided evidence tending to establish that there have not been any instances of actual confusion. Gross Aff. at 8; Rossner Aff. (a survey of personnel working at The Gap's stores near the ten largest retail outlets for Plaintiffs' socks, mostly Sears stores, found that there were no reported instances of actual confusion, and a nationwide computerized inquiry to The Gap's stores resulted in no reported instances of actual confusion); Corsiglia Aff. at 1–2 (Regional Manager for Atlanta Region received no reports of instances of actual confusion from The Gap's store managers).

**40.** Garrison Aff.Exh. A (photocopy of Thomson & Thomson's Trademark Search Report on the mark WORKFORCE).

**41.** Garrison Aff.Exh. A.

many trademarks and servicemarks for many, many other products and services.[42]

Barco of California ("Barco") is a seller of work uniforms for both men and women. Barco markets tops, pants, dresses, shirts, laboratory coats, blazers, sweaters, jumpers, jumpsuits, and sweatshirts. In 1980, Barco commenced use of the "WORKFORCE" trademark to identify its products, and it has continued since then to use the "WORKFORCE" mark.[43] Barco and The Gap have entered into a license agreement, which provides that The Gap is the licensee of Barco's rights in the "WORKFORCE" mark.

### F. The Present Action

Plaintiffs claim that Defendant's use of the marks "WORK FORCE," "WORKFORCE," and "WORK–FORCE" has unlawfully infringed upon Plaintiffs' allegedly validly registered trademark "WORKFORCE" (Reg. No. 1,156,470), in violation of 15 U.S.C. § 1114.[44] Plaintiffs also allege that Defendant falsely designated Defendant's goods as coming from Plaintiffs, in violation of 15 U.S.C. § 1125(a),[45] and falsely procured a trademark registration of the "WORK FORCE" mark. Finally,

Plaintiffs allege that Defendant has violated the North Carolina Unfair Trade Practices Act, N.C.Gen.Stat. § 75–1.1,[46] and Plaintiffs' common law trademark rights.

### V. DISCUSSION ON PENDING MOTIONS

#### A. Defendant's Motion for Summary Judgment

1. Improper Registration of the "WORKFORCE" Trademark

■ Defendant claims it is entitled to summary judgment as to Plaintiffs' First Claim for Relief—and as to its counterclaim seeking cancellation Reg. No. 1,156,470—because such registration is allegedly void. Defendant argues at length that Workforce, Inc.'s Declaration of Use and Incontestability is void because it was not executed by the "registrant" of the trademark. According to Defendant, Plaintiff Workforce, Inc. never acquired the "WORKFORCE" trademark by assignment because there is a "gap" in the chain of title from Plaintiff United States Hosiery, a Delaware corporation, to Plaintiff Workforce, Inc. Instead, there exists only a

---

**42.** Garrison Aff.Exh. A.

**43.** Goudeau Aff. at 1.

**44.** Section 1114 of Title 15, United States Code, states, in pertinent part, the following:
(1) Any person who shall, without the consent of the registrant—
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion, or to cause mistake, or to deceive;* ... shall be liable in a civil action by the registrant....
15 U.S.C.A. § 1114(1)(a) (West 1963) (emphasis added).

**45.** Section 1125(a) of Title 15, United States Code, states, in pertinent part, the following:
Any person who shall affix, apply, or annexn in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods to enter into commerce ... shall be

liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.
15 U.S.C.A. § 1125(a) (West 1982) (Section 43(a) of the Lanham Act).

**46.** Section 75–1.1 of the North Carolina General Statutes states, in pertinent part, the following:
(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.
(b) For the purpose of this section, "commerce" includes all business activities, however denominated....
N.C.Gen.Stat. § 75–1.1 (Oct.1988). "The North Carolina law of unfair competition affords protection against the tortious appropriation of trade names and trademarks alike." *Polo Fashions, Inc. v. Gordon Group,* 627 F.Supp. 878, 891 (M.D.N.C.1985) (citing *Charcoal Steak House, Inc. v. Staley,* 263 N.C. 199, 202, 139 S.E.2d 185, 187 (1964)). Under North Carolina common law, unfair acts of a defendant can be redressed in an action for common law unfair competition when such acts damage a plaintiff's legitimate business. *Polo Fashions, Inc. v. Craftex, Inc.,* 816 F.2d 145, 148 (4th Cir.1987).

chain of title indicating that United States Hosiery, a *North Carolina* corporation, assigned Reg. No. 1,156,470 to Workforce, Inc. Defendant has cited no case law to support this legal position.

Plaintiffs have explained that there really is only a mistake in the paper work and that such mistake should not have any substantive consequences. According to Plaintiffs, the appearance in the assignment papers of the words "a North Carolina corporation" was, and is, a mere typographical or editorial mistake.[47]

This Court is of the opinion that this ground for summary judgment is without merit.

### 2. Likelihood of Confusion

■ Plaintiffs must establish at least four things in order to prevail on their First, Second, Fourth, and Fifth Claims for Relief: (1) ownership of (2) a valid trademark (3) which was used by Defendant in a trademark sense without the owner's consent (4) in a manner likely to cause confusion. Under 15 U.S.C. § 1114(1), the test for trademark infringement is whether there is a likelihood of confusion between the alleged infringing mark and the registered trademark holder's mark. *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir.1987). Under 15 U.S.C. § 1125(a), the test is substantially the same: "whether there is a confusing similarity between the two marks." *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d at 148. Actions for unfair competition and common law trademark infringement also hinge upon the likelihood of confusion; as a panel of the United States Court of Appeals explained in *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145,

> As used in [N.C.Gen.Stat. § 75–1.1], the words "unfair methods of competition, have not been precisely defined by the North Carolina courts, although it has been suggested that they encompass any conduct which a court of equity would consider unfair. A practice is unfair if it is unethical or unscrupulous, and it is deceptive *if it has a tendency to deceive.*

*Id.* at 148 (emphasis added) (citing *Harrington Mfg. Co. v. Powell Mfg. Co.*, 38 N.C.App. 393, 248 S.E.2d 739, 744, 746 (1978), *disc. rev. and cert. denied*, 296 N.C. 411, 251 S.E.2d 469 (1979); and *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397, 403 (1981)).

Defendant contends that the undisputed material facts establish that The Gap's use of the "WORK FORCE," "WORK-FORCE," and "WORK–FORCE" marks is not likely to deceive the public or cause confusion.

In the Fourth Circuit, likelihood of confusion in trademark cases is a question of fact. *Durox Co. v. Duron Paint Mfg. Co., Inc.*, 320 F.2d 882, 885 (4th Cir.1963); *see also Marcon, Ltd. v. Helena Rubenstein, Inc.*, 694 F.2d 953, 955 (4th Cir.1982). *But cf. Sweats Fashions v. Pannill Knitting Co.*, 833 F.2d 1560, 1565 (Fed.Cir.1987) (likelihood of confusion is issue of *law* that may be readily resolved on summary judgment). Although likelihood of confusion is a fact-intensive question, summary judgment, as discussed above, is appropriate when there are no genuine issues of material fact.

■ Some, but by no means all, of the factors the trier of fact may consider as to whether a likelihood of confusion exists are:

> (1) the strength or distinctiveness of the mark sought to be protected by the plaintiff;
>
> (2) the similarity between the mark of plaintiff and the alleged infringing mark;
>
> (3) the similarity of the goods or services identified by the two marks;
>
> (4) the similarity of the facilities or marketing channels used in the two businesses;
>
> (5) the similarity of the purchasers or the customers of the two businesses;
>
> (6) evidence of actual confusion;
>
> (7) the intent of the alleged infringer.

*Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d at 148; *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984);

---

**47.** *See* Moffitt Aff. (explaining the typographical error).

*Marcon, Ltd. v. Helena Rubenstein, Inc.,* 694 F.2d 953, 955 (4th Cir.1982); *Supermarkets General Corp. v. Pathmark Title Co., Inc.,* 686 F.Supp. 535, 537 (D.Md.1987). Not all of these factors are always relevant or equally emphasized in each case. *Pizzeria Uno Corp. v. Temple,* 747 F.2d at 1527 (citing *Modular Cinemas of America, Inc. v. Mini Cinemas Corp.,* 348 F.Supp. 578, 582 (S.D.N.Y.1972)).

Defendant's arguments, Plaintiffs' responses, and this Court's analysis on each of these elements follows.

(a) *Distinctiveness*

 The first and paramount factor is the distinctiveness or strength of the mark sought to be protected. *Pizzeria Uno Corp. v. Temple,* 747 F.2d at 1527. There are five possible classifications for trademarks, listed here in ascending order of distinctiveness or strength: generic, descriptive, suggestive, arbitrary, and fanciful. *See id.* (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976)). These classifications, however, are difficult to apply in practice. A mark classified according to this system for a particular product may be in a different classification for another product; a mark may change classifications through changes in usage over time; a mark may have one meaning to one group of users and another altogether different meaning to another group of users; and the same mark may be put to different uses with respect to a single product. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d at 9.

 A mark that is merely descriptive will be considered a weak mark and will not be accorded trademark protection unless there is proof that the public mind associates the descriptive mark with a particular source or deliverer of goods. *Pizzeria Uno Corp. v. Temple,* 747 F.2d at 1527. This association is often called secondary meaning, although in trademark law secondary meaning is of primary importance to establish trademark rights. By contrast, suggestive, arbitrary, and fanciful marks are ordinarily considered strong marks, which are presumed to be entitled

to broad trademark protection without any showing of secondary meaning. *Id.* (citing *Del Laboratories, Inc. v. Alleghany Pharmacal Corp.,* 516 F.Supp. 777, 780 (S.D.N.Y.1981)). Suggestive, arbitrary, or fanciful marks " 'will ordinarily be protected against the use of the same or a confusingly similar mark *on the same product, or related products, and even on those which may be considered by some to be unrelated but which the public is likely to assume emanate from the trade mark owner.*' " *Id.* (quoting 1 Gilson, *Trademark Protection and Practice* § 2.01, pp. 2–3 to 2–4 (1984)). On the other hand, weak marks generally get either no protection or only narrow protection against closely similar marks used on virtually identical products. *Id.*

 If the mark has been previously and frequently used by others, particularly in the same field of goods or services, then the distinctiveness of the mark is diminished. *Id.* at 1530–31 (citing *Arrow Distilleries, Inc. v. Globe Brewing Co.,* 117 F.2d 347, 351 (4th Cir.1941)). " 'The greater the number of identical or more or less similar trade-marks already in use on different kinds of goods, the less is the likelihood of confusion.' " *Id.* at 1531 (quoting *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259–260 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980)).

Defendant asserts Plaintiffs' "WORKFORCE" mark is weak and not distinctive and that the ambit of its protection narrow because third parties have used the designation "WORKFORCE" on work clothing (Barco), work boots (M.T. Shaw), and for a temporary labor service. Plaintiff, on the other hand, argues that its mark is distinctive and that the question of third party use, which may dilute the strength of the mark, is a question properly for the jury.

 This Court is of the opinion that there is no genuine issue of material fact regarding the proper classification of the "WORKFORCE" mark. Plaintiffs' use of the "WORKFORCE" mark makes it a suggestive mark. If Plaintiffs used the

"WORKFORCE" mark in connection with a temporary labor service, then the mark "WORKFORCE" would be more descriptive and, consequently, would be weaker. On the other hand, Plaintiffs' use of "WORKFORCE" mark is not totally arbitrary because there is some connection between the mark and the goods sold; workers in the work force may use socks designed primarily for rough, or work, use. Nor is the "WORKFORCE" mark fanciful; instead, "work force" (two words) is an accepted English word defined in many English dictionaries. *See, e.g., Webster's Ninth New Collegiate Dictionary* 1359 (1988) ("the workers engaged in a specific activity ... the number of workers potentially assignable for any purpose"). Unlike "Pepsi" or "Exxon," which are coined, purely fanciful, words, "work force" has a meaning apart from its use as a service or trade mark.

Plaintiffs' use of the "WORKFORCE" mark is suggestive because it conjures up images of workers and their associated down to earth, rough and tumble, frantic at times, lifestyle. It also has a modern ring to it, recalling Fritz Lang's "Metropolis" or Charlie Chaplin's "Modern Times." Plaintiffs chose the "WORKFORCE" mark because they wanted to convey an image of rugged durability. The "WORKFORCE" mark certainly does not convey images of high-fashion playboys and glitzy sophisticates.

Plaintiffs' type of product—work socks—is suggested by the "WORKFORCE" mark, but other products—work boots, for example—could also be just as easily suggested by the "WORKFORCE" mark. While the "WORKFORCE" mark is suggestive and entitled to some protection without any showing of secondary meaning, there is a serious question as to how much protection it should be accorded; use by third parties may have diluted the strength or distinctiveness of this suggestive mark. A suggestive mark may be so diluted by widespread use by third parties that it no longer has any distinctiveness at all.

From the evidence that now appears in the record, a reasonable trier of fact could decide that Plaintiffs' mark is not only suggestive but also very strong. Conversely, a reasonable trier of fact could also decide that the mark is not very distinctive because it has been used—and could be used—to market a variety of products. Therefore, this Court is of the opinion that there is a genuine issue of material fact regarding the distinctiveness of the "WORKFORCE" mark; a trier of fact will have to determine how much—if any—dilution has occurred due to third parties' use of the "WORKFORCE" mark, and variations of it, on their products.

### (b) *Similarity of the Marks*

Defendant asserts that the design, suggestion, and presentation of the two marks are dissimilar as a matter of law. Plaintiffs assert that there is clearly only a jury question here on the dissimilarity or similarity of the marks.

This Court is of the opinion that there is a genuine issue of material fact regarding the similarity of the marks in question. Both marks include the words "WORK" and "FORCE." Plaintiffs' mark has the two words together in a single formation, "WORKFORCE," while Defendant's mark appears most often as "WORK FORCE." Thus, the marks are virtually identical in most cases, and in some cases they are identical.

Defendant, however, has sought to use the "WORK FORCE" mark in its labeling and advertising program in a humorous, almost satirical way—although there is also an element of reverence towards ordinary working folk. Plaintiffs' use of the "WORKFORCE" mark is much more serious and straight-forward—a true glorification of the traditional American hardhat worker. Thus, the marks are virtually identical, but the marks are presented to the public in noticeably different ways on the labels, in advertisements, and on point of sale displays.

Examples of Defendant's use of the "WORK FORCE" mark on its labels are appended to this Memorandum and Order as Illustrations two through eleven. Ex-

amples of Plaintiffs' use of the "WORK-FORCE" mark on its labels are appended to this Memorandum and Order as Illustrations twelve through sixteen.

This Court readily admits it notices differences in presentation, message, and effect conveyed by the parties' differing uses of their marks and is of the opinion that such differences provide a distinction between the two marks. It is quite another thing, however, for this Court to say in good conscience that no rational trier of fact could (1) find the marks to be identical and (2) find, in addition, that the manner of presentation of the two identical marks provides little, if any, meaningful distinction between them. This Court is of the opinion that the evidence in record is sufficient for a rational trier of fact to find that the marks are virtually indistinguishable. Therefore, there is a genuine issue of material fact on the similarity of the two marks.

### (c) *Similarity of the goods*

The absence of direct competition between goods bearing the alleged infringer's mark and goods bearing the protected mark is not a bar to relief under 15 U.S.C. § 1114 where there is a likelihood of confusion. *AMP, Inc. v. Foy*, 540 F.2d 1181, 1183 (4th Cir.1976); *Shoney's Inc. v. Schoenbaum*, 686 F.Supp. 554, 561 (E.D. Va.1988). "Direct competition is but one of the factors to be considered in answering whether there is a likelihood of confusion." *Id.* (citing *Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 861 (5th Cir.1967)). When the parties are not competitors, the issue of infringement hinges on the likelihood of confusion about the source or sponsorship of the alleged infringer's goods or services. *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1252 (4th Cir.1970). On the other hand, "[c]omplementary products, or services, are particularly vulnerable to confusion." *Id.* (citing *Aunt Jemima Mills Co. v. Rigney & Co.*, 247 F. 407 (2d Cir. 1917) (pancake syrup and pancake flour), *cert. denied*, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1918)).

Defendant contends the two marks are used on unrelated products that do not compete with each other. On the other hand, Plaintiffs have cited many cases which appear to hold that hosiery and wearing apparel are related products. *See generally* F. Pinckney, *Products Comparison Manual for Trademark Users* 232–236 (1988) (listing numerous cases gathered from United States Patents Quarterly for the years 1929 through 1986 which "hold" (1) that there were similarities in hosiery products and other products or (2) that there were similarities in the marks on hosiery products and the marks on other products).

This Court is of the opinion that there is a genuine issue of material fact regarding the similarities of the parties' goods. On the one hand they are similar because all of the parties' products are used to clothe human beings. On the other hand they are different because the goods are marketed with an eye towards certain definite and distinct uses: work wear versus casual wear. Although the products are marketed with different images for different primary target audiences, there is a strong possibility that the purchasers of these products do not make any distinction between "work wear" and "casual wear" when they actually use the products. Certainly, based on the evidence now in the record, a rational trier of fact could find the goods similar or dissimilar.

In trademark infringement cases when the goods are dissimilar, courts will often also consider whether plaintiff is likely to "bridge the gap" between the plaintiff's type of product and the type of product offered by defendant. If it appears that the plaintiff is likely to bridge the gap, then the plaintiff may be able to assert its trademark rights over another's use on a product that is unrelated to the plaintiff's product.

Defendant contends that Plaintiffs have shown no evidence of a real intent to expand from the manufacturing and marketing of socks into other areas of clothing manufacture and marketing. Plaintiffs contend that they have preserved their right to expand their use of the "WORK-FORCE" mark into other related fields by manufacturing labels for jeans bearing the

"WORKFORCE" mark, by affirmatively deciding to expand into other areas, and by actually selling such goods interstate commerce.

This Court has previously characterized the likelihood that Plaintiffs will "bridge the gap" as a wish rather than a reality. A rational trier of fact, however, could very well decide from the evidence now in the record that the Plaintiffs have taken substantial steps towards the establishment of the "WORKFORCE" mark on their own line of men's and ladies' apparel. This Court, on a motion for summary judgment, cannot choose between competing interpretations of the evidence when there is sufficient evidence to support either interpretation. Therefore, this Court finds that there is a genuine issue of material fact as to the similarity of the parties' goods and as to likelihood that Plaintiffs' will "bridge the gap," if there is a gap.

**(d)** *Similarity of the channels of trade*

Defendant contends that the channels of commerce, or trade, in which the parties' products move are totally different. Defendant points out that its goods are *only* sold in its company-owned stores while Plaintiffs' goods are sold primarily at Sears and other retail outlets. Plaintiffs contend, contrary to Defendant's assertions, that the parties' goods are sold in similar channels of trade (shopping malls).

Again, this Court does not believe it can resolve this question on a motion for summary judgment. The evidence in the record supports either interpretation, and a rational trier of fact could very well find the channels of trade are similar or different. Therefore, there is a genuine issue of material fact regarding the similarity of the channels of trade.

**(e)** *Similarity of the purchasers of the goods*

Defendant contends that the type of people who purchase Plaintiffs' "WORK-FORCE" socks are not the same type of people who purchase Defendant's "WORK FORCE" clothing. Plaintiffs contend there is no evidence establishing this factor one way or the other. This Court believes that there is insufficient evidence in record at this point to support Defendant's contention that the people who actually purchase Plaintiffs' socks are different from the people who actually purchase Defendant's clothes. Defendant has presented, however, at least some evidence tending to show that the parties' target audiences are different. Thus, there is a genuine issue of material fact regarding the type of persons who purchase the parties' goods.

**(f)** *Defendant's intentions*

Defendant contends it adopted the "WORK FORCE" mark with no intention of passing off its products as Plaintiffs' products. Plaintiffs contend that intent is not relevant to determine the infringement issue. When likelihood of confusion is found, lack of intent to profit by another's mark will not provide a defense in a trademark infringement case. On the other hand, if there is evidence that an alleged infringer adopted another's mark with the intent to profit thereby, such evidence is highly probative on the issue of the likelihood of confusion.

The evidence in the record before this Court tends to establish rather strongly that Defendant adopted the "WORK FORCE" mark without any intent to profit wrongfully from Plaintiffs' use of the "WORKFORCE" mark. At some point, however, Defendant did become aware of Plaintiffs' use of the "WORKFORCE" mark, but it appears from the record before this Court that Defendant went ahead with its plans to use the "WORK FORCE" mark because it perceived little likelihood of confusion. Defendant did anticipate that Plaintiffs might object to Defendant's use, but such anticipation does not necessarily evince a guilty heart. In any event, this Court is of the opinion that the evidence in the record regarding Defendant's intent is such that a rational trier of fact could reach different inferences and conclusions, and, therefore, there is a genuine issue of material fact regarding Defendant's intent.

**(g)** *Instances of actual confusion*

Defendant contends that discovery has not revealed any instances of actual confu-

sion. Plaintiffs contend that there have been instances of confusion and that, in any event, actual confusion is not necessary to establish trademark infringement.

This Court is of the opinion that the record discloses that there are genuine issues of material fact regarding the existence or non-existence of any instances of actual confusion.

### 3. Fraudulent Registration of a Trademark

Plaintiffs have conceded that Summary Judgment in Defendant's favor is appropriate on Plaintiffs' Third Claim for Relief because the undisputed evidence shows that Defendant has not registered the WORKFORCE trademark. Therefore, this Court shall grant Defendant's Motion for Summary Judgment as to Plaintiff's Third Claim for Relief.

### 4. Accounting of Profits

Defendant contends that if its motion for summary judgment on Plaintiffs' First, Second, Fourth, and Fifth Claims for Relief is denied, it should not be compelled, in all fairness, to provide an accounting of profits because it had no intent to pass off its goods as those of the Plaintiffs or to otherwise exploit Plaintiffs' good will or reputation or both, to the extent such good will or reputation exists. Plaintiffs contend that this is a jury question, with the jury to decide whether Defendant proceeded in good faith to use the "WORK FORCE," "WORK-FORCE," and "WORKFORCE" marks.

This Court has carefully considered all of the evidence in the record and is of the opinion that there is a genuine issue of material fact regarding Defendant's good faith.

### B. *Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs are seeking summary judgment in their favor on Defendant's Sixth Affirmative Defense and on Plaintiffs' Third Affirmative Defense to Defendant's Counterclaim.

The issues raised in this motion relate to the Barco–Gap licensing agreement. These issues are fairly fact-intensive, and no point would be served by detailing the parties's numerous disputes on this issue. Plaintiffs assert that the licensing agreement between the Gap and Barco, which was executed shortly before the preliminary injunction hearing a year ago, has not been carried out by its terms and that, therefore, Barco has waived its rights in the trademark "WORKFORCE" by licensing it to the Gap without proper supervision over the Gap's products.

Defendant claims that the facts surrounding the Barco agreement are perfectly without any hint of wrongdoing and that Barco has not in any way waived its rights in the "WORKFORCE" mark.

This Court is of the opinion that it would be premature to enter summary judgment on this point because there are genuinely disputed issues of material fact. Therefore, this Court will deny Plaintiff's Motion for Partial Summary Judgment.

### C. *Plaintiffs' Further Motion for Partial Summary Judgment*

Plaintiffs assert that they should be granted summary judgment on the issue of the validity and enforceability of the trademark registered under Reg. No. 1,156,470. Again, Plaintiffs assert that the procedures before the United States Patent and Trademark Office were proper and any irregularities, including the incorrect denomination of United States Hosiery as a North Carolina corporation, are de minimis. This Court believes there are no genuinely disputed issues of material fact on this point, and, therefore, this Court will grant Plaintiff's Further Motion for Partial Summary Judgment. Consequently, this Court will dismiss Defendant's Counterclaim.

### VI. OTHER MATTERS

Since a trial will be necessary in this case, the parties are reminded that, in accordance with this Court's order filed on October 24, 1988, they will have fourteen days from the date of filing of this Memorandum and Order to file their trial briefs,

motions in limine, and motions for jury instructions.[48]

## VII. CONCLUSIONS

NOW, THEREFORE, IT IS ORDERED that

(1) Defendant's Motion for Summary Judgment, filed September 27, 1988, is DENIED IN PART and GRANTED IN PART;

(2) Plaintiffs' Third Claim for Relief shall be, and hereby is, DISMISSED;

(3) Plaintiffs' Motion for Partial Summary Judgment, filed September 27, 1988, is DENIED;

(4) Plaintiffs' Further Motion for Partial Summary Judgment, filed October 11, 1988, is GRANTED; and

(5) Defendant's Counterclaim is DISMISSED.

**48.** In a letter dated October 25, 1988, one of Defendant's attorneys, John H. Hasty, requested that this Court extend the fourteen (14) day deadline. The undersigned believes that such an extension of time is entirely unwarranted, but Judge Voorhees, who will be now assuming control over this case, may have a different opinion. Therefore, the parties should take the matter up with him.

APPENDIX

ILLUSTRATION ONE

ILLUSTRATION TWO

ILLUSTRATION THREE

ILLUSTRATION FOUR

ILLUSTRATION FIVE

ILLUSTRATION SIX

ILLUSTRATION SEVEN

# WORK-FORCE

## MEN'S BASIC DENIM JEANS

**PILOT**
**Tapered Fit**

- fuller seat and thigh than our slim fit
- leg width tapers from thigh to leg opening

**COLORS**
ALL STORES:
double stonewash, off the wall grey, black

**SELECT STORES:**
regular stonewash, ice wash blue, "black and blue", stonewash grey, off the wall khaki, overdyed colors, bleach (Nov)

**NAVIGATOR**
**Slim Fit**

- our slimmest fitting jean
- a narrow fit through the seat and thighs
- available in waist 25

**COLORS**
SELECTED STORES:
double stonewash

**SIZES**
26W-34W

**MECHANIC**
**Easy Fit**

- this fit has the most ease through the seat, thigh and knee
- wider leg opening
- slightly scoop pockets

**COLORS**
ALL STORES:
double stonewash

**SELECT STORES:**
overdyed black, off the wall grey, bleach (Nov)

# ILLUSTRATION SEVEN—Continued

## WOMEN'S BASIC DENIM JEANS

SIZES 27W–40W

SIZES 28W–40W

### SECOND SHIFT
**Tight Fit**

- our tightest fit
- skin tight through the hips, seat and thighs

COLORS
stonewash blue
bleach (Nov.)

SIZES
1/2 - 15/16
Regular length 30" – all colors
Longer length 32" – stonewash blue only

### BOSS
**Slim Fit**

- a snug fit slightly fuller in the hips, seat and thighs than our tight fit

COLORS:
black
stonewash blue
bleach (Nov.)

SIZES
1/2 - 15/16
Regular length 30" – all colors
Longer length 32" – stonewash blue only

### FIRST CLASS
**High Rise**

- same fit as our slim fit with a longer front and back rise (the rise is the measurement from the waist to the crotch in the front and back of a pant)

COLORS
stonewash blue

SIZES
1/2 - 15/16
Regular length 30" – all colors
Longer length 32" – stonewash blue only

### RELAX
**Easy Fit**

- a relaxed fit fuller through the seat and thighs
- more ease in the rise than our tight or slim fits

COLORS
stonewash blue
black

SIZES
1/2 - 15/16
Regular length 30" – all colors
Longer length 32" – stonewash blue only

ILLUSTRATION EIGHT

ILLUSTRATION NINE

ILLUSTRATION TEN

828

ILLUSTRATION TWELVE

ILLUSTRATION THIRTEEN

ILLUSTRATION FOURTEEN

ILLUSTRATION FIFTEEN

ILLUSTRATION SIXTEEN

