SHONEY'S, INC., a Tennessee corporation, doing business in Virginia as Shoney's, Inc. of Tennessee; Shoney's Lodging, Inc., a Tennessee corporation, Plaintiffs–Appellants,

v.

Leon SCHOENBAUM; Ruth Ann Schoenbaum; Shoney's, Inc., a Virginia corporation, Defendants–Appellees.

SHONEY'S, INC., a Tennessee corporation, doing business in Virginia as Shoney's, Inc. of Tennessee; Shoney's Lodging, Inc., a Tennessee corporation, Plaintiffs–Appellees,

v.

Leon SCHOENBAUM; Ruth Ann Schoenbaum; Shoney's, Inc., a Virginia corporation, Defendants–Appellants.

Nos. 88–3613, 88–3617.

United States Court of Appeals, Fourth Circuit.

Argued March 8, 1989.

Decided Jan. 16, 1990.

Terence Murphy (Hunter W. Sims, Jr., Kaufman & Canoles, Norfolk, Va., Gary M. Brown, Trabue, Sturdivant & DeWitt, on brief) for appellants.

Michael Bruce Ware (Herbert V. Kelly, Jones, Blechman, Woltz & Kelly, P.C., Newport News, Va., on brief) for appellees.

Before WIDENER and PHILLIPS, Circuit Judges, and DOUMAR, District Judge for the Eastern District of Virginia, sitting by designation.

PHILLIPS, Circuit Judge:

This appeal arises from a dispute over use of the well-known restaurant and motel trade-name, "Shoney's," that arose when Shoney's Lodging, Inc., a wholly-owned subsidiary of Shoney's, Inc. of Tennessee, licensed use of the trade-name "Shoney's Inn" to a motel facility located in an area of eastern Virginia in which the defendants Leon and Ruth Ann Schoenbaum held a previous license for the exclusive operation of restaurants under the "Shoney's" trade-name. The specific dispute was whether the preexisting license agreement only protected the Schoenbaums from use of the name "Shoney's" in connection with restaurant operations in the area, or from any use. In a declaratory judgment action brought by Shoney's, Inc. of Tennessee and its subsidiary (together, Shoney's–Tennessee) against the Schoenbaums and their Virginia operating corporation, Shoney's, Incorporated (together, the Schoenbaums), the parties joined issue as to whether the Shoney's Inn licensing either violated the Schoenbaums' contract rights under their exclusive license agreement, or constituted a trademark infringement in violation of the Lanham Act, or constituted unfair competition. The district court, 686 F.Supp. 554, rejected any claim of a Lanham Act violation or unfair competition but found

the Shoney's Inn licensing a breach of the Schoenbaum's rights under the licensing agreement, and entered a remedial injunctive decree against Shoney's–Tennessee. We affirm.

I

Shoney's–Tennessee licenses its mark "Shoney's," which it registered with the United States Patent and Trademark Office in 1978, to independent franchisees throughout the country in connection with their operation of restaurants. Shoney's Lodging similarly licenses the use of the mark "Shoney's Inn," which Shoney's–Tennessee registered in 1982, to independent franchisees in connection with their operation of motels.

The relationship between the Shoney's mark and the Schoenbaum family began in the early 1950s. At that time, the Schoenbaums owned the Parkette Commissary, a company which developed several restaurants. In 1954, Leon Schoenbaum sold his interest in the company to his brother Alex for approximately $20,000 and used the money to open a restaurant in the Tidewater, Virginia area. Before the restaurant opened, however, the brothers agreed, as evidenced by a letter in 1955, that Leon would have the "exclusive right" to the use of the name "Shoney's" in the Tidewater area (Newport News, Hampton, Warwick, and Williamsburg, Virginia). Leon subsequently opened many more "Shoney's" restaurants in the area. In 1970, in contemplation of some structural changes in Parkette Commissary, Alex Schoenbaum as president updated the agreement with Leon, reiterating the grant of the exclusive right to the use of the name "Shoney's" and more specifically delineating the territory to which the exclusive right applied.

The year 1984 also marked a change in the brothers' business relationship. Before then, through an agreement between the Marriott Corporation (Marriott) and Shoney's–Tennessee, Leon's Virginia restaurants, as well as most other "Shoney's" restaurants, were operated in affiliation with the "Big Boy" trademarks and service marks, which were owned by Marriott.

Under this agreement, and a corresponding subsidiary agreement, Big Boy Franchises, Inc., a West Virginia corporation, provided Shoney's–Virginia with the things ordinarily provided in a "Systems Arrangement," such as specifications, furnishings, promotional material, etc. In 1984, however, Shoney's–Tennessee and Marriott entered into an agreement under which Shoney's–Tennessee and its restaurant franchisees were to disassociate from the "Big Boy" trademark. As part of this agreement, Shoney's–Tennessee was required to obtain separate release agreements from each of its franchisees so that they could retain their Shoney's franchises. These new agreements provided that the "Systems Arrangements" would then be between Shoney's–Tennessee and its franchisees directly. The release agreement executed by the Schoenbaums in May 1984 additionally stipulated that Shoney's–Tennessee and the Schoenbaums would later enter into a license agreement concerning the continued operation of restaurants in the Tidewater area. The later license agreement, dated November 1, 1984, provides that "[Shoney's–Tennessee] grants to [the Schoenbaums], for the term and subject to the conditions set forth herein, the exclusive right to use the Shoney's System, Trade Names and Marks within the Licensed Territory as hereinafter described." 1984 License Agreement at 2; J.A. at 511. The agreement further provides that "the distinguishing features of the Shoney's System, include but are not limited to, the name 'Shoney's'; ... tradenames, trademarks, and service marks." 1984 License Agreement at 1; J.A. 510.

In mid–1985, Shoney's Lodging, Inc. contracted with William Darter, d/b/a Urban Developers, Inc. (Darter), granting him a "Shoney's Inn" license for the operation of a Shoney's Inn in the Tidewater area. This license is accompanied by a "Systems Arrangement," under which Darter receives Shoney's system of opening and operating hotels under the name of "Shoney's Inn." Similar to the 1984 Systems Arrangement with Shoney's–Virginia, this agreement provides *inter alia* that

certain distinguishing features of the System include ... the use of the names "Shoney's" and "Shoney's Inn" in combination with the designs, insignia, logos, signs, slogans, tradenames, trademarks, and service marks used in Shoney's Inn units owned or licensed by [Shoney's–Tennessee] at other locations; and ... WHEREAS, Licensor's parent corporation, Shoney's[–Tennessee], in its restaurant operations has established a reputation with the public in connection with the name "Shoney's," which reputation has a unique benefit and value to Shoney's, Inc.....

1985 License Agreement at 1; J.A. 533.

Upon learning of the license agreement with Darter, the Schoenbaums twice informed Shoney's–Tennessee that they considered that their 1984 license agreement granted them the exclusive right to the use of the name "Shoney's" in the Tidewater area. Shoney's–Tennessee and Shoney's Lodging then filed this action, seeking a declaration of rights under the 1984 agreement. In its answer to the complaint, the Schoenbaums raised several affirmative defenses and sought injunctive relief for alleged trademark infringement and unfair competition.

Following a bench trial, the district court rejected both the claims of Lanham Act violation and unfair competition, but held that Shoney's–Tennessee's licensing of the "Shoney's Inn" to Darter constituted a breach of its 1984 licensing agreement with the Schoenbaums. Accordingly, the court entered a decree, stayed pending any appeal, which enjoined Shoney's–Tennessee from further breaches of the 1984 licensing agreement, and specifically ordered that the offending name "Shoney's Inn" being used in breach of the 1984 agreement be changed to avoid any use of the name "Shoney's."

Shoney's–Tennessee appealed, and the Schoenbaums filed a protective "cross-appeal."

## II

The only issue on appeal relates to the district court's breach of contract determination. The Schoenbaums do not challenge rejection of the Lanham Act and unfair competition claims. The potential contract breach issues are further narrowed by the parties' positions on this appeal respecting the district court's resolution of the breach of contract claim. The district court first addressed the question whether under Tennessee law, which controlled by party agreement, the 1984 license agreement should be considered a complete integration of the parties' agreements respecting the matters at issue. It held that by virtue of an express merger clause in that agreement, it was to be so considered, thereby making irrelevant, for content purposes, any prior written or oral agreements respecting those matters. J.A. 383–84. It next addressed the question whether the integrated 1984 agreement was or was not facially unambiguous on the matters at issue, hence whether parol evidence might be admissible to aid in its interpretation. On this, the court concluded that, as a matter of law, the relevant provisions of the 1984 agreement were unambiguous and therefore should be interpreted by the court, as a matter of law, according to their literal language. J.A. 384–85. The court then proceeded to interpret the contract in a way which led it to find the contract breached by the Shoney's Inn licensing to Darter.

On this appeal, neither party challenges the district court's threshold determinations that (1) the 1984 agreement constituted a complete integration of their agreements respecting the matters at issue, and (2) their agreement was facially unambiguous on those matters, thereby making parol evidence inadmissible as an aid to its interpretation. The parties simply disagree over whether the district court's ensuing interpretation of the critical provisions underlying its conclusion of contract breach was or was not erroneous as a matter of law.*

---

* Both parties urge as their principal positions on this appeal that the 1984 agreement completely controls and unambiguously defines, as a matter of law, their legal relations in the matters at

We therefore address as the sole and dispositive issue on this appeal whether the district court erred as a matter of law in its interpretation of the critical provisions of the 1984 agreement upon which its finding of a breach of contract was based.

As indicated, the dispositive question of contract interpretation—as both parties and the district court agreed throughout—is whether the 1984 licensing agreement protected the Schoenbaums from *any* use of the trade name "Shoney's" in their exclusive territory or only its use in conjunction with the operation of restaurants. The district court concluded on the basis of a detailed analysis of the relevant provisions that the protection ran to *any* use. We might well simply affirm its resulting judgment for the Schoenbaums on the basis of the court's reasoning. We think it sufficient in any event merely to summarize that reasoning and point out why, in our judgment, Shoney's–Tennessee's arguments against it on this appeal fail.

In summary, the district court, as did the parties, identified two sets of provisions whose obvious relevance to the dispositive issue required interpretation *in pari materia.* These provisions, as the court saw it, were the basic granting clause in Section I, paragraph 1, which provided in critical part:

> 1. *License and Licensed Territory.* Licensor grants to licensee, for the terms and subject to the conditions set forth herein, the exclusive right to use the Shoney's System, Trade Names and Marks within the licensed territory as hereinafter described.

coupled with the provision in the Recitals and Definitions Section immediately preceding that

> the distinguishing features of the Shoney's System, includes but are not limited to, the name "Shoney's". . . .

J.A. 511.

Parsing these provisions according to their plain, literal meanings, particularly emphasizing the dictionary meaning of "exclusive right," the district court opined in critical part that by these provisions

> the Schoenbaums ... were granted the exclusive right to the name Shoney's in the [licensed] area, as the name Shoney's is a part of the Shoney's System. This in turn prohibits the licensor from granting the use of the name Shoney's, or using the name themselves, in any other establishment in the [licensed] area. Thus, the licensee is assured that no other uses of the word will be made in the ... area. . . .

J.A. 397.

Shoney's–Tennessee contended in the district court, and continues here to contend, that the clear literal import of these provisions is overridden by other provisions of the agreement defining the nature of the operating rights granted to the Schoenbaums. These provisions, says Shoney's–Tennessee, unambiguously confine the grant of operating rights to the operation of restaurants. This being so, the argument continues, the exclusive right to use the trade name "Shoney's," granted in conjunction with the basic grant of exclusive

issue, but, of course, differ over the proper legal interpretation. *See* Appellant's Br. 10–11 (Summary of Argument); 17 ("position is that the Agreement clearly and unambiguously limits the grant ..."); Appellees' Brief 19 ("the 1984 License Agreement ... clearly and unambiguously conveyed ... the exclusive right to the name 'Shoney's'"). Both, in rather confused fallback positions, do then also contend *arguendo* that *if* the 1984 agreement were found ambiguous by this court (against the positions of both), extrinsic evidence before the district court would be admissible and would support the opposing interpretations urged by the parties. *See* Appellant's Br. 17 (position asserted *"arguendo"*); Appellees' Br. 23 (position asserted conditionally by "cross-appeal"). Because the

parties do not, therefore, disagree that the district court correctly held that the language of the 1984 agreement completely and unambiguously defined their legal relations on the matter at issue, we have no need to address the correctness of that holding. We may observe, however, that, as the parties presumably recognized, it finds ample support in the record and under controlling Tennessee law and general authority. *See, e.g., Anderson v. St. Louis Terminal Warehouse Co.,* 173 F.2d 436, 438 (6th Cir.1949) (construing Tennessee law on integrated contracts); *Ward v. Berry & Assoc.,* 614 S.W.2d 372, 374 (Tenn.Ct.App.1981) (applying Tennessee parol evidence rule); *see generally* E.A. Farnsworth, *Contracts* § 7.3, at 458 (effect of merger clause in contract interpretation).

operating rights, is similarly limited to use in the operation of restaurants and does not extend to any other uses. The district court expressly rejected this interpretation with reasoning that we find unassailable in logic and compelling under the relevant canons of contract interpretation. Specifically, the court accepted the first prong of the interpretation urged by Shoney's–Tennessee: that the operating rights granted to the Schoenbaums by the 1984 agreement, hence *their* use of the trade name "Shoney's," were confined to the operation of restaurants. As the court succinctly put it:

> [T]he Schoenbaums were granted only the right to open and operate restaurants and nothing else. This protects the licensor from the Schoenbaums' using the name Shoney's on anything but a restaurant—not on grocery stores, dry cleaners, motels or any other type of establishment.

*Id.*

But the court rejected the further argument that this compelled the inference, as a matter of contract interpretation, that the Schoenbaums' concomitant protection against use by *others* of the name Shoney's within the licensed area extended only to uses in conjunction with the operation of restaurants. Instead, as the court interpreted the critical provisions granting exclusive operating and trade name use rights to the Schoenbaums, the protections of the name-use grant were not so limited. Specifically construing the interrelation between the reciprocal trade-name protections created by these granting provisions, the court opined that they

> protect[ ] the licensor from the Schoenbaums using the name Shoney's on anything but a restaurant ... [and] in turn prohibit[ ] the licensor from granting ... or using the name themselves, on any other establishment in the [licensed] area.

*Id.*

As indicated, we need say little more than that this interpretation is supported in logic and by the traditional canons of statutory construction. The most relevant provision—that defining the scope of the license in Section I.1.—literally grants to the Schoenbaums, with no express limitations, "the exclusive right to use the Shoney's System, Trade Names and Mark within the licensed area." Not only is this literal grant of an exclusive territorial right to trade name use internally unlimited, neither is there elsewhere in the agreement any express limitation on this granting language nor any arguably overriding express reservation of trade name use rights by Shoney's–Tennessee. The only language in the agreement speaking directly to the dispositive interpretive issue thus flatly supports the district court's interpretation.

Unable to point to any literal limitation on this critical granting language or any express reservation of joint name-use rights elsewhere in the agreement, Shoney's–Tennessee essentially contends, with a variety of arguments, that such a limitation or reservation is nevertheless implicit in the agreement construed as a whole. The principal argument is that because—as the district court itself concluded—the Schoenbaums' affirmative operating and trade name use rights were limited to their operation of restaurants, then so of necessity must be their protection against trade name use by Shoney's–Tennessee or its licensees within the licensed territory. This is said to be a necessary implication principally for two reasons: first, because, as the district court itself recognized at the critical times leading up to the 1984 Agreement, "the parties were thinking and talking only about the operation of a restaurant business and not for other purposes." J.A. 384. Second, the critical language of the granting provision itself gives primacy to the "Shoney's System" as the principal object of the "exclusive right" granted, plainly indicating that the grant with respect to "Trade Names and Marks," which followed, was subordinate and confined to uses in conjunction with the "System," which pertained only to restaurant operation.

As the district court recognized, however, neither of these arguments compelled retreat from the literal interpretation

which the basic rule of contract interpretation counselled. Nothing in trademark law precludes parties by contract from giving different measures of affirmative rights and negative protections in respect of trade mark use. There is nothing therefore which legally prohibits an agreement that while a licensee shall only be able to use a trade name within a licensed area for a limited purpose, it shall be protected against its use in that area by the licensor (or its licensees) for any purpose. Furthermore, the mere fact that at the critical times leading to contract formation the parties here may have been thinking only of restaurant *operation* by the licensee does not negative the possibility that they might nevertheless agree to give a wider protection against trade name use than that incident to restaurant operation. As the district court pointed out, there are obvious economic reasons associated with considerations of good will and the avoidance of customer confusion for making trade name use protection of a licensee run wider than the licensee's affirmative right of use. J.A. 397. Hence, an interpretation of this agreement according to its literal import is not made unreasonable because it would be at odds either with the law or practical business concerns.

Given the nature of the dispute over dispositive terms here, where each of the parties basically argues that the provisions in issue unambiguously support an interpretation that accords with his own intention but is at odds with the other's interpretation, we think it appropriate to make a few observations about the process of judicial interpretation relevant to decision here. The first is that the process does not depend ultimately upon any ability to discern mutually held intentions of the parties. The very fact that dispute later arises suggests that there well may never have been any mutually held intention of the parties or, indeed, that the precise matter at issue was never considered. Lack of certitude about subjectively held intentions does not avoid the judicial obligation nevertheless to interpret disputed terms and thereby to decide the legal controversy. In such situations courts simply have to declare the

"law of the particular contract" by giving a "legal effect" to the disputed provisions. This may or may not accord with the subjective intentions had by one or the other, or indeed by either of the parties. *See generally,* E.A. Farnsworth, *Contracts* §§ 7.1; 7.7; 7.9, p. 491. In this the interpretive process simply parallels substantive contract laws' concern with objective "manifestations of assent" rather than subjective "meetings of the minds" in contract formation. It is precisely to aid in this judicial process that the traditional rules or canons of contract interpretation have been developed. Their service is to point toward that interpretation which in the absence of certitude about mutually held party intentions is the most reasonable one suggested by the language used by the parties to express their agreement. *Id.* § 7.11. Though the slipperiness of these canons is legendary and specific uses by courts sometimes the object of rightful cynicism, the basic ones among them, based as they are on long experience and common sense, have undoubted utility for this purpose. Chief among these is the fundamental rule that the parties are assumed to have intended that the language employed in an integrated contract should have its plain, commonly-understood meaning in expressing their agreement. *Id.* at p. 495. That rule essentially serves to dictate the proper legal interpretation of the disputed terms here at issue. Here, as generally, given the ultimate dependence of all language on context, even the most intrinsically "plain" language must be assessed contextually to guard against an obviously unintended meaning. But as above indicated, contextual assessment here does nothing to undercut the validity of the assumption that "exclusive right to use the Shoney's System, Trade Names and Marks within the licensed Territory ..." means exactly what it seems to mean in common understanding: that within the licensed territory no one but the Schoenbaums had any right during the licensed period to use the trade name "Shoney's" in any connection.

The district court therefore did not err in interpreting the 1984 Agreement as having

that legal effect, and on that basis finding the Agreement breached by Shoney's–Tennessee's act of licensing Darter to use the name "Shoney's Inn" in the licensed territory, and entering an appropriate remedial decree. The judgment of the district court is therefore affirmed.

AFFIRMED.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

Any contract analysis must originate with the language of the contract. "[C]ourts look to the language of the instrument and to the intention of the parties and impose a construction which is fair and reasonable." *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn.Ct.App.1987).[1]

In this case, the contract could not be more clear. The Virginia Schoenbaums have acquired the exclusive right to use the "Shoney's System" in the tidewater area of Virginia. The "Shoney's System" under the terms of the contract "include[s]" "the name 'Shoney's'." The contract explicitly defines "Shoney's System" as a "system of opening and operating *restaurants*" (emphasis added). Indeed, even the district court found no ambiguity within the agreement and that the agreement addressed only restaurants. So, it is at once apparent that the operation of an inn or motel does not fall within the terms of the agreement.

This conclusion is supported by the fact that two separate and distinct service marks, "Shoney's" (Reg. No. 1,088,370, Mar. 28, 1973) and "Shoney's Inn" (Reg. No. 1,190,289, Feb. 16, 1982), were in existence when the contract was made. The presumption of an exclusive right to use a registered mark "extends only so far as the goods or services noted in the registration certificate...." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). 15 U.S.C.

§ 1115(a) similarly provides that the registration of the mark is prima facie evidence of the exclusive right to use the mark in commerce in connection with the goods and services specified in the registration.[2] The registration certificate for the "Shoney's" mark limits its use to "restaurant services." The certificate for "Shoney's Inn" is limited to "motel services." Both service marks existed at the time the contract was made but only "Shoney's" was mentioned in the contract. Thus, only restaurant services having been addressed by the contract, which is corroborated by the existence of the two service marks, the use of "Shoney's Inn" was neither permitted nor intended to be included under the words "Shoney's System."

When a court is presented with alternate constructions, "one of which makes it fair, customary and such as prudent men would naturally execute, while the other makes it inequitable, unusual or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred." *Wilkerson v. Williams*, 667 S.W.2d 72, 79 (Tenn.Ct.App.1983), *quoting Commerce Street Co. v. Goodyear Tire & Rubber Co.*, 31 Tenn.App. 314, 215 S.W.2d 4 (1948).

It is beyond argument that the Virginia Schoenbaums do not have the right to operate a Shoney's Inn within the area in which they are licensed to operate Shoney's Systems, an area consisting of 9 counties and 11 cities in eastern Virginia, making up substantially all the heavily populated and thriving Virginia Beach, Norfolk, and Hampton Roads area of the State. That much was decided by the district court and underscored by the majority opinion in this case:

> [T]he [Virginia] Schoenbaums were granted only the right to open and operate restaurants and nothing else. This protects the ... [Tennessee Schoenb-

---

1. I note that the contract between the parties provides that Tennessee law applies.

2. "(a) Any registration issued ... or of a mark registered on the principal register ... shall be prima facie evidence of the validity of the registered mark and of the registration of the

mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with *the goods and services specified in the registration....*" (Emphasis added.)

aums] from the [Virginia] Schoenbaums' using the name Shoney's on anything but a restaurant—not on grocery stores, dry cleaners, motels or any other type of establishment.

To this holding no exception is taken. So it is patent from the papers before us that the Virginia Schoenbaums have no right to operate a Shoney's Inn within the territory. Indeed they seek no right to operate such a motel within their territory. Their claim, quite simply, is that *no one* may operate a Shoney's Inn *motel* within the territory assigned for Shoney's *restaurants* to the Virginia Schoenbaums.

I suggest that this construction of the contract by the Virginia Schoenbaums, and adopted by the district court and our court, is nothing more nor less than a dog in the manger construction.[3] While the Virginia Schoenbaums do not wish to operate Shoney's Inns within the contested area, they wish to assure that no one else may do so. That construction, in the words of the Tennessee courts, which we are bound to follow, in my opinion, is "inequitable, unusual or such as reasonable men would not be likely to enter into." It is not an agreement which is "fair, customary and such as prudent men would naturally execute."

Not only does the majority take the strained construction of the contract instead of an "interpretation which makes a rational and probable agreement ... preferred", it expands without support, I submit, the wording of the contract which includes only the operation of "restaurants" to include that of "motels." I find no justification for this departure from the explicit contract terms, either in the documents themselves or in the record.

I would reverse.

---

**3.** Dog in the manger [so called fr. the fable of the dog who would not allow a horse or ox to eat the hay in a manger, even though he did not want it himself]: a person who selfishly withholds from others something that he himself cannot use or does not need. *Webster's Third New International Dictionary,* 1971.